The ABENAKI NATION OF MISSISS-QUOI, the Abenaki Tribal Council, Dee Brightstar, Dorcus Churchill, Michael Delaney, Blackhorse Phillips, Hilda Robtoy, April St. Francis, David St. Francis, Homer Francis, and Robert Wells, all on their own behalves and on Behalf of the Abenaki People

v.

James K. HUGHES, Lt. Colonel, District Engineer of the New England Division of the Corps of Engineers of the United States Department of the Army, William F. Lawless, P.E., Chief Regulatory Branch, Operations Division, of the Corps of Engineers of the United States Department of the Army, Philip R. Harris, Colonel, Division Engineer of the New England Division of the Corps of Engineers of the United States Department of the Army, Michael P.W. Stone, Secretary of the Army, The Village of Swanton, Vermont, and George Lague, Village Manager of the Village of Swanton, Vermont.

Civ. A. No. 2:92–CV–279.

United States District Court,
D. Vermont.

Oct. 22, 1992.

James A. Dumont, Cindy E. Hill, Sessions, Keiner, Dumont, Barnes & Everitt, Middlebury, Vt., for plaintiffs.

Thomas D. Anderson, Helen M. Toor, Asst. U.S. Attys., Burlington, Vt., for defendants James K. Hughes, Lt. Colonel, et al., William F. Lawless, P.E., et al., Philip R. Harris, Colonel, et al., Michael P.W. Stone, Secretary of Army.

Stephen C. Walke Jr., Paterson & Walke, P.C., Montpelier, Vt., for defendants The Village of Swanton, Vt. and George Lague, Village Manager of Village of Swanton, Vt.

## OPINION AND ORDER

PARKER, Chief Judge.

### I. *Introduction*

Plaintiffs moved for a temporary restraining order and preliminary injunction to enjoin defendants from all actions associated with raising the spillway elevation of the Orman Croft Generating Station, a hydroelectric facility in Highgate, Vermont. The parties agreed to a hearing on the merits and plaintiffs withdrew their temporary restraining order in early September, 1992. The parties understood and agreed that a decision on the merits would obviate the need for a preliminary injunction.

The litigation stems from the authorization granted to the Village of Swanton (hereafter "the Village") to raise the spillway elevation of the Orman Croft Generating Station (hereafter "the Project") by the Army Corps of Engineers (hereafter "the Corps") on July 15, 1992. Pursuant to Section 404 of the Federal Water Pollution Control Act, 33 U.S.C. § 1344(e), this authorization was granted under a general permit, General Permit 38, first issued by the Corps in 1982 and reissued in 1987.

Plaintiffs claim that General Permit 38 (hereafter "GP 38") is invalid because of procedural violations. Even if valid, plaintiffs claim that the Project is not eligible

for authorization under GP 38. Plaintiffs also allege that the authorization granted by the Corps under GP 38 violates a variety of federal statutes, specifically (1) The National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 (1992) (hereafter "NEPA"); (2) the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (1992) (popularly known as the Clean Water Act) (hereafter "CWA"); (3) the National Historic Preservation Act, 16 U.S.C. § 470 et seq. (1992) (hereafter "NHPA"); and (4) the Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001–3013 (1992) (hereafter "NAGPRA"). For these reasons plaintiffs claim that the authorization by the Corps is void and that until the Project is properly permitted all activity connected with it must cease.

## II. *Background*

The Village has operated a hydroelectric facility at Highgate Falls since 1928. It has upgraded the facility twice before, in 1930 and 1954, and in 1979 decided to upgrade it again.[1]

In order to proceed with this proposed Project, the Village was required to apply for a license from the Federal Energy Regulatory Commission (hereafter "FERC") pursuant to the Federal Power Act, 16 U.S.C. §§ 791a–828 (1992). It also needed a permit from the Corps for the discharge of dredged or fill material [2] into the Missisquoi River pursuant to the Corps' responsibilities under the CWA, 33 U.S.C. § 1344.

Before issuing a license, the FERC must consider not only the power and development issues involved with a project but also issues related to the project's impact on environmental quality.[3] For its part, the Corps may issue individual permits on a project by project basis (otherwise known as individual § 404 permits) or general permits, if activities involved "will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment," on a State, regional or nationwide basis. 33 U.S.C. § 1344(e)(1).[4]

On October 22, 1982 the Corps issued GP 38 (administrative record (AR) 170) for certain hydroelectric development activities in the New England region.[5] The public notice of the proposed GP 38 declared that

1. To increase the output of electric energy, the Village initially sought to install a fourth turbine generator in the powerhouse and raise the dam to an elevation of 200 feet. The Village's final proposal seeks to raise the level of the dam to 190 feet.

2. The "discharge" in this case consists of the placement of concrete to raise the concrete spill of the dam from an elevation of 167.5 feet to 175 feet with an inflatable spillway rubber gate installed atop the new crest for a total height of 190 feet.

3. Specifically, the Federal Power Act requires that

    [T]he [FERC], in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.
    16 U.S.C. § 797(e).

4. The distinction between nationwide permits and regional permits (both of which are general

permits) is an important one in light of some last minute argument submitted by plaintiffs. A nationwide permit is just that—a permit issued by the Office of the Chief of Engineers that provides a nationwide permit for the discharge of dredged or fill material into navigable waters such as the Missisquoi. Projects meeting the conditions set out in the permit itself and in the regulations promulgated by the Corps in accordance with section 404 of the CWA, 33 C.F.R. § 330 (1992), are eligible under these nationwide permits and can thereby avoid the individual § 404 permitting process. Regional permits are issued on a regional basis by the division or district engineer. Regional permits may either modify a nationwide permit for a particular region, 33 C.F.R. § 330.1(d), or be issued unrelated to any nationwide permit and authorizing other discharges which meet the conditions set forth in the regional permit and in the regulations governing it, 33 C.F.R. § 325. Thus a regional permit can be directly related to a nationwide permit or distinctly independent.

5. GP 38 implemented a Memorandum of Understanding ("MoU") entered into by FERC and the Secretary of the Army for the purpose of minimizing duplication of Federal review in regard to hydroelectric projects in the New England region. (AR 104).

[T]o avoid duplicating the regulatory control exercised by the Federal Energy Regulatory Commission (FERC) for hydropower development or expansion projects which cause minimal or no adverse environmental effects, the New England Division of the U.S. Army Corps of Engineers proposes to issue a general permit that, subject to certain conditions, would eliminate the need for Corps of Engineers approval of fills associated with such work at existing dams or at new or existing run-of-river projects throughout New England.

(AR 146).

GP 38 was subject to six Special Conditions ("SC") and 24 General Conditions. (AR 189). The second SC states that the "activity which includes the discharge must be licensed or formally exempted by the [FERC]. No discharge is allowed unless and until the [FERC] license or formal exemption, as well as all other required local, State and Federal licenses and permits have been obtained." (AR 189).

In short, GP 38 provided for FERC to be the lead agency in regulating hydroelectric projects in the New England Region and ensuring that they complied with applicable regulations, including NEPA and NHPA. While the Corps was still responsible for ensuring compliance with the dictates of the CWA, GP 38 called for the Corps to utilize the information gathered by the FERC and issue authorization if the discharge "cause[d] minimal or no adverse environmental effects." If FERC concluded that there would be more than minimal adverse effects, or if the Corps determined on its own that a proposed action was outside the realm of GP 38, permit appli-

cants would not be eligible for authorization under GP 38 and would have to proceed with an individual § 404 permit application.

Some time after the Corps issued GP 38 the Village commenced efforts to obtain the necessary permits for the envisioned improvements to the Highgate facility. Pursuant to the FPA and NEPA, the FERC conducted an Environmental Assessment ("EA") of the Project and made a Finding of No Significant Impact ("FONSI"). (AR 105). Specifically it found that the project would result in only "short-term minor [environmental] impacts" and concluded that "issuance of a license, as conditioned herein, for the project will not constitute a major Federal action significantly affecting the quality of the human environment." (AR 105 at p. 8).[6]

Prior to issuance of the FERC license, the Corps determined that the project was eligible under GP 38 and issued the authorization to proceed on January 24, 1984. The Corps based its determination on the Village's application for a permit, its FERC license application and the EA conducted by FERC. (AR 143). On May 24, 1984 FERC issued a license for the Project. (AR 105).

In 1987 GP 38 was reissued for another five years with several changes and amendments after public notice was given (AR 178) and a supplement to the 1982 Statement of Findings was made.[7] (AR 188). In the meantime, work on the Project remained in the initial stages. On January 22, 1990, the Village filed a request with FERC for the amendment of its license, proposing to reduce the overall height of

---

**6.** FERC's finding that the Project did not constitute a major Federal action was based on its EA and on the conditions imposed on the Village by the License. These conditions included a mitigation plan to compensate for the loss of any wetlands caused by the Project and for the Village to fund a cultural resource management plan for "previously unrecorded archaeological or historical sites" discovered during the construction. (AR 105, article 44). FERC's finding meant that the threshold for triggering a more detailed environmental impact statement

("EIS") under NEPA was not crossed. Plaintiff does not contest the license issued by FERC.

**7.** GP 38 was reissued in almost its original form save for three new permit conditions, added as a result of comments received by the Corps and the withdrawal of Rhode Island and Massachusetts from its scope. The new conditions made GP 38 a reporting general permit, and implemented further reporting and authorization recommendations from the states of Vermont and Connecticut.

the project.[8] In considering this request, FERC found that the amended project would "reduce the adverse effects of the project, most significantly those impacts on cultural resources and wetlands." (AR 106 at p. 2). On March 14, 1991, FERC issued an order amending the original license to conform with the Village's proposed changes. (AR 106).

On September 5, 1991, the Village submitted a request to the Corps for authorization under GP 38 for the reduced Project. The Village initially believed that the authorization granted by the Corps in 1984 was suitable ground to grant authorization in 1991. (AR 5) In informal meetings and discussions as early as mid-September 1991 (AR 4) and as late as February, 1992, (AR 44) Corps personnel from the New England Division informed the Village that the Project was not eligible for authorization under GP 38 and that an individual § 404 permit would be necessary. This conclusion was based upon an expressed concern regarding the adverse impact of the Project on wetlands and the inadequacy of proposed mitigation plans.

Corps Headquarters agreed with the New England Division that an individual § 404 permit would be required if mitiga-

tion plans were not adequate but also stated that a conditioned general permit assuring adequate mitigation would allow authorization under GP 38. (AR 84). It advised the New England Division that adequate mitigation could be considered to remain below the minimal impact threshold for the general permit just as under NEPA it can be considered to reach a finding of no significant impact. (AR 103).

After consultation with the Vermont state archeologist concerning historical resources at the mitigation sites (AR 87, 94), the Village (AR 92), and Corps Headquarters (AR 101, 103), the Corps issued a conditioned authorization under GP 38 on July 15, 1992. (AR 132). This conditioned authorization imposed 23 Special Conditions ("SC") which the Corps believes ensures that the Project will cause minimal or no adverse impact making it eligible for authorization under GP 38.[9] It is this authorization to which plaintiffs object.

## III. *Discussion*

### A. Basis of Review

#### 1. *Jurisdiction*

Plaintiffs allege violations of the Administrative Procedure Act, 5 U.S.C. §§ 500–

---

**8.** The Village sought to reduce the proposed increased elevation of the dam from 200 feet to 190 feet.

**9.** The twenty-three Special Conditions ("SC") attached to the Village's permit establish an intensely detailed plan for achieving the mitigation goal of replacing lost wetland functions and values, and protecting cultural and historic resources threatened, as a result of the Project.

The plan requires a two year monitoring period to determine if manipulation is necessary to create the compensatory wetlands and detailed instructions for the manner of conducting such monitoring. (SC 4, 5, 6). If manipulation or flooding is necessary to create the wetlands, the Village must develop and submit a site design for review and approval by the Corps. (SC 5, 10).

SC 7 and 18 provide specific steps to be taken in order to protect any cultural or historic resources located at the mitigation sites in the event that manipulation or flooding is necessary and for the location of staging areas. These steps include conducting a Phase I and if necessary, a Phase II archaeological study, mitigation in the way of avoidance or data recovery, hand

excavating any monitoring wells which may be necessary by the Village's consulting archaeologist, joint supervision of the site by the Corps, the Advisory Council on Historic Preservation and the Vermont State Historic Preservation Office, and a prohibition on work at the site until written approval has been received from the Corps.

Following the completion of the mitigation areas, a five year period of monitoring to determine the mitigation sites' degree of success will be required of the Village with detailed, semiannual reports to be submitted to the Corps for review and approval. (SC 12) If after the five year monitoring period the Corps determines that the mitigation sites have failed to provide 30 acres of compensatory wetlands, a supplementary mitigation site and proposal must be prepared by the Village and reviewed and approved by the Corps. This supplementary proposal, upon Corps approval, will be added as a Special Condition to the permit. (SC 17).

There is also provision for riverbank stabilization, (SC 21) and an erosion control plan. (SC 22). The Special Conditions are mandatory and failure to comply with them would violate the permit and subject the Village to the Corps' enforcement provisions. (AR 132).

590 (1992) (hereafter "APA"), NEPA, CWA, NHPA and NAGPRA. The court has jurisdiction under 28 U.S.C. § 1331 to hear these claims.

### 2. Standard of Review

Courts traditionally afford the decisions of administrative agencies due deference in reviewing agency action. *See, Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

The Second Circuit has stated the appropriate standard of review when reviewing actions and decisions by the Corps to issue permits. "In reviewing the validity of a decision by the Corps to issue a permit under the [CWA], a court should, as provided by the [APA], uphold the decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sierra Club v. United States Army Corps of Eng.,* 701 F.2d 1011, 1032 (2d Cir.1983) (quoting 5 U.S.C. § 706(2)(A)). In defining arbitrary and capricious, the Second Circuit has stated that

> [A]n agency's decision is held to be arbitrary and capricious when it relies on factors Congress did not want considered, or utterly fails to analyze an important aspect of the problem, or offers an explanation contrary to the evidence before it, or its explanation ... is so implausible that it cannot be ascribed to differing views or agency expertise.

*Sierra Club v. United States Army Corps of Eng.,* 772 F.2d 1043, 1051 (2d Cir.1985). ▪ Accordingly, any review of the decision by the Corps to authorize the Project under GP 38 is limited to the arbitrary and capricious standard as established by statute and defined by relevant case law.

### B. Plaintiffs' Claims

#### 1. Claim 1—General Permit 38 is Invalid

Plaintiffs assert that General Permit 38, first issued in 1982 and reissued in 1987, is invalid because it fails to comply with the requirements of the APA, NEPA and the Corps' own regulations.

#### a. APA

▪ Plaintiffs claim that GP 38 is a "rule" under the APA because it is an agency statement of general applicability designed to implement the CWA. As a "rule" the APA requires it to be published in the Federal Register. 5 U.S.C. § 553. Plaintiffs claim that because GP 38 is a rule and the Corps failed to publish it in the Federal Register, it is invalid and any authorization stemming from is void.

While facially attractive, this claim is unsupported by both the APA and case law. The APA defines "rule" as the "whole or part of an agency statement of general or particular applicability and future effect designed to implement law." 5 U.S.C. § 551(4). It defines adjudication as the "agency process for formulation of an order." 5 U.S.C. § 551(7). An order is defined in turn as "the whole or part of a final disposition, whether affirmative, negative, injunctive or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). License is defined to "include the whole or part of an agency permit...." 5 U.S.C. § 551(8).

From these definitions a general permit is more appropriately classified as an adjudication rather than a rule. Such a conclusion was reached in *National Wildlife Federation v. Marsh,* 568 F.Supp. 985, 992 n. 12 (D.C.1983), which stated that a "permit decision-making proceeding is clearly adjudication rather than rule making." As an "adjudication" and not a "rule," publication of GP 38 in the Federal Register was unnecessary. GP 38 was not issued in violation of the APA.

#### b. NEPA

▪ Plaintiffs claim that the issuance of GP 38 was a major federal action significantly affecting the environment and that prior to issuing GP 38 the Corps prepared neither an EIS nor an EA and therefore violated the dictates of NEPA.

NEPA requires that

[A]ll agencies of the Federal Government shall— ...

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action. . . .

42 U.S.C. § 4332(2)(C)(i), (ii) and (iii) (1992).

The Council on Environmental Quality ("CEQ") is responsible for interpreting and administering NEPA. 42 U.S.C. §§ 4342–44. The regulations promulgated by the CEQ are found in 40 C.F.R. §§ 1500–1517. The regulations establish that this "detailed statement," known as an environmental impact study ("EIS"), is unnecessary if an agency finds through an environment assessment ("EA") that a major federal action will not have a significant impact on the quality of human life, generally known as a finding of no significant impact. ("FONSI"). 33 C.F.R. § 1501.4(a)(2). The CEQ defined an EA at § 1508.9, but specifically left the procedures by which an EA is prepared to the individual agencies. § 1501.3. The Corps has promulgated such procedures and they are found at 33 C.F.R. Part 230.

The Corps procedures for implementing NEPA state that "[m]ost permits will nor-mally require only an EA." 33 C.F.R. § 230.7(a). The procedures define an EA as a "brief document which provides sufficient information to a [Corps] district commander on potential environmental effects of the proposed action, and, if appropriate, its alternatives for determining whether to prepare an EIS or a FONSI." § 230.10(a). No specific format is required, § 230.10(b), but an EA should include a brief discussion of the need for the proposed action, the environmental impacts of the proposed action and a list of agencies and interested parties consulted.

As to the initial issuance of GP 38, plaintiffs' claim is factually incorrect. The administrative record contains an EA conducted by the Corps in 1982 prior to the issuance of GP 38 (AR 171) as well as a statement of findings. (AR 170). Both of these documents satisfy the procedural requirements of NEPA as set out in 33 C.F.R. § 325.2(a)(4) and (6). The FONSI reached by the Corps in 1982 rendered the requirement for an EIS unnecessary.

Plaintiffs assert that the 1987 version of GP 38 was a new permit[10] and at the least a new EA should have been conducted by the Corps. It is not clear from the statute or the regulations whether reissuing GP 38 in 1987 served to make it a "new" general permit and hence subject to a new round of scrutiny under NEPA or whether reissuing only required an updated statement of findings. The Corps obviously believed the latter was the correct course as it only

---

**10.** In a literally last minute filing and a post-hearing memorandum, plaintiffs assert that the October 28, 1982 public notice of the issuance of GP 38 (AR 176) classified GP 38 as a modification of a nationwide permit for hydroelectric projects with a capacity of not more than 1500 kilowatts. Because there was no limit placed on the capacity of hydroelectric projects in GP 38, plaintiffs argue that the 1987 reissuance of GP 38 was truly a "new" permit and required a new EA. Alternatively, plaintiffs claim that by the terms of the 1500 kw nationwide permit, public notice of any reissuance or modification of it was to be published in the Federal Register. 47 Fed.Reg. 31834.

Plaintiffs' argument hinges on the claim that GP 38 was a modification of the nationwide permit based on the October 28, 1982 public notice. It was not. The public notice issued after GP 38 was issued states that "[t]his region-al general permit *supplements* a nationwide general permit issued earlier by the Corps that applies only to FERC-regulated work at existing reservoirs which involves a total generating capacity of 1500 kilowatts or less. . . ." (AR 176) This language is also repeated in the Corps' EA (AR 171) and Statement of Findings (AR 170) issued in 1982. By definition, supplement means to add to whereas modify means to limit. Thus, GP 38 was not a modification of the nationwide 1500 kw permit. Moreover, the terms of GP 38 and the guide sent to project managers for implementation of GP 38 (AR 175) make it clear that GP 38 was intended to be a different animal altogether from the nationwide permit. As such, the Corps was required to adhere to the procedures of 33 C.F.R. § 325 but it was not required to publish public notice in the Federal Register.

prepared a supplement to the 1982 statement of findings. (AR 188).

The regulations promulgated by the Corps concerning the processing of permits, 33 C.F.R. Part 325, do shed light on this issue indirectly. Section 325.3(b) requires that public notice be published for reissuance of existing regional permits within their area of jurisdiction. It is clear that the Corps complied with this regulation. (AR 176, 180). Section 325.7(a) directs that modifications which result in "significant increases in scope of a permitted activity will be processed as new applications for permits." Such modifications would clearly be "new permits" for NEPA purposes and require a new EA. But a proposal to reissue a permit which is not significantly different in scope from its predecessor is not a "new permit" and need not be subjected to the scrutiny attended its forebear. Indeed, reissuing a permit seems more akin to extending an existing permit than issuing a new one.[11] The Corps treats extensions of permits due to expire as follows:

> Requests for extensions will be processed in accordance with the regular procedures of § 325.2 of this part, except that such processing is not required where the district engineer determines that there have been no significant changes in the attendant circumstances since the authorization was issued.

33 C.F.R. § 325.6(d).

GP 38 was reissued in essentially the same form in 1987. (AR 189). It neither increased the scope of activities eligible for authorization under it nor decreased the regulation of those activities. In fact, it added reporting requirements for permit applicants and limited its geographic scope. (AR 190) After publishing public notice and considering comments received from the public, the Corps issued a supplemental statement of findings that the activities authorized under GP 38 caused minimal acceptable environmental impacts. (AR 177). Although there is no explicit regulation stating that this was all the procedure required, related regulations suggest that it is.

Based on the administrative record and this analysis, it was not necessary for the Corps to conduct a new EA in 1987 in order to reissue GP 38. By conducting the original EA in 1982, making two statements of findings and complying with the notice provisions, the Corps met the requirements of NEPA when it issued and reissued GP 38.

### c. Corps Regulations

Plaintiffs contend that the Corps violated its own regulations governing the issuance of permits under the CWA by not providing notice and the chance to comment on impending general permits to the public, 33 C.F.R. § 325.3(a), and more specifically, to Indian tribes, § 325.3(d), and by not preparing either an EA or an EIS prior to issuance. This latter claim was addressed above and need not be repeated.

Plaintiffs claim that the Corps failed to notify anyone in Vermont of the proposed GP 38. Factually this is incorrect. The Corps provided notice of the proposed GP 38 to municipalities, state agencies and officials, private organizations and some individuals.[12] (AR 147, 148).

■ The Corps did not directly notify plaintiffs and would thus be in violation of 33 C.F.R. § 325.3(d) if any of the plaintiffs qualified as an Indian tribe. However, neither the Abenaki Nation of Mississquoi, the Abenaki Tribal Council nor the Abenaki people are recognized by the Bureau of Indian Affairs as a federal Indian tribe.[13]

---

**11.** The Corps originally sought to extend the expiration date of GP 38. (AR 178). The Corps was unable to do so before GP 38 expired so it was forced to reissue it. The Corps seems to have treated reissuing the permit in the same light as extending its expiration date.

**12.** Plaintiffs' mistake here is understandable. At the time they submitted their pretrial brief plaintiffs had only been provided with the general mailing list used by the Corps. Only later did they receive the Vermont mailing list used by the Corps in 1982 and 1987.

**13.** A list of recognized Indian tribes is published at 53 Fed.Reg. No. 250, p. 52829, *et seq.* (1988) and the Abenaki Nation of Mississquoi is not included on that list. Nor have they been included since the list was published. Declaration of Holly Reckord, Acting Chief for the Branch

Section 325.3(d) requires the Corps to provide notice to "appropriate Indian Tribes or tribal representatives." The Corps' failure to provide notice to the plaintiff was reasonable in light of the plaintiffs absence from the list of federally recognized tribes and the extensive notice it provided to other public forums and groups. Because the Corps did not violate its own regulations or those imposed by NEPA or the APA in issuing GP 38, plaintiff's claim that GP 38 is invalid fails.

### 2. Claim II—The July 15, 1992 Authorization Violated NEPA

In the early stages of the permit process reinitiated by the Village in its September 9, 1991 permit application, Corps personnel indicated that the Project would not be eligible for authorization under GP 38 because of its impact on wetlands. (AR 4, 5, 9/17/91). Corps personnel also indicated that an EIS might be necessary because of significant impact on the human environment. (AR 14, 10/25/91). Corps personnel maintained these positions until as late as February 27, 1992. (AR 58). In early March of 1992 the Corps modified its position, (AR 60, 61), holding out the possibility that with upfront mitigation which had reasonable assurance of success, the Project would become eligible under GP 38. (AR 60). The Village capitalized on this possibility, preparing mitigation plans and agreeing to the conditions imposed by the Corps, leading to the authorization under GP 38 for the Project. (AR 132).

Plaintiffs claim that this chain of events was in violation of NEPA. Specifically, they allege defendants violated NEPA by not preparing an EIS, by failing to give adequate consideration to historic resources at the Project site, improperly relying on the FERC EA and failing to provide proper notice of its intent not to conduct an EIS.

#### a. Failure to perform an EIS

Plaintiffs' contention that the Corps was required to conduct an EIS before authorizing the Project under GP 38 apparently stems (1) from the informal statements from Corps personnel that an EIS would be necessary and (2) from the Corps decision that the Project could be authorized under GP 38 if adequate mitigation was reasonably assured.

As to the informal statements made by Corps personnel regarding the need for an EIS, it would hardly make sense to hold the Corps, or any other agency, bound by the informal statements of its employees. *See, e.g., American Trucking Assns. v. Atchinson, T. & S.F.R. Co.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967) (agency "faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation").

Plaintiffs do not contest this but rather argue that the Corps has failed to articulate a rational connection between the facts found and the choice made.

■ The administrative record indicates that once the Corps reached the position that it was possible that the Project could be permitted under GP 38 *if* the authorization was conditioned upon an adequate mitigation plan for cultural and biological impacts, the Corps gave great consideration to whether or not the mitigation plan proposed by the Village was adequate. (AR 60, 64, 65, 66, 69, 70, 71, 72, 74, 78, 79, 82, 87, 92, 93, 94). Moreover, the mitigation plan is mandated by the authorization and the Project cannot proceed unless the plan is followed. (AR 132). Based on these facts, the Corps' decision to authorize the Project under GP 38 was rationally related to the facts found and the decision cannot be said to be arbitrary and capricious.

Even with a mitigation plan reducing the impacts of the Project to "minimal," plaintiffs maintain that the requirements of NEPA apply and defendants were required to conduct an EIS before granting authorization.

The authorization granted on July 15, 1992 was conditioned upon the satisfaction of 23 specific conditions concerning the cre-

---

of Acknowledgement and Research, Bureau of Indian Affairs.

ation of 30 acres of wetlands to compensate for the loss of wetlands caused by the Project and the impact on any historical or cultural resources. (AR 132). These conditions were imposed in order to cause the Project to remain below the minimal impact threshold for GP 38. Implicitly, it also avoided the need to prepare an EIS.[14] Plaintiffs rely on a memorandum prepared by the CEQ to support their claim that the mitigation plan does not obviate the need for an EIS under NEPA.

In its memorandum, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations", 46 Fed.Reg. 18,026 (1981), the CEQ said:

> Mitigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal. As a general rule, the regulations contemplate that agencies should use a broad approach in defining significance and should not rely on the possibility of mitigation as an excuse to avoid the EIS requirement.

*Id.* at 18,038. Because the mitigation plan was not part of the original proposal nor imposed by statute or regulation, plaintiffs contend that the Corps' reliance on the mitigation plan to avoid the EIS requirement was unjustified.

The Supreme Court has held that CEQ *regulations* are entitled to substantial deference. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 354, 109 S.Ct. 1835, 1848, 104 L.Ed.2d 351 (1989). However, in considering the weight of this CEQ memorandum, the D.C. Circuit has stated that "[CEQ] interpretations are generally entitled to deference ... [t]he "Forty Questions" publication, however, is merely an informal statement, not a regulation, and we do not find it to be persuasive authority." *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982) (citations omitted). *See also, Friends of the Earth v. Hintz,* 800 F.2d 822, 837 n. 15 (9th Cir.1986) (courts have uniformly held that "Forty Questions" is not controlling authority, citing decisions in the 5th, 9th and D.C. Circuits). While other circuits (including this one) have referenced the memorandum in reaching a decision, *see, Sierra Club v. Marsh,* 769 F.2d 868, 877 (1st Cir.1985) (reversing Corps decision based on promised mitigation plan); *Sierra Club v. United States Army Corps of Engineers,* 772 F.2d 1043, 1059 (2d Cir.1985) (Mansfield, concurring), none have held that the memorandum is binding or entitled to substantial deference as CEQ regulations are.

Not only have courts given the "Forty Questions" document slight deference, but the majority of them have specifically held that mitigation measures are appropriately considered in determining whether a federal action will have a significant impact or not. *See generally, C.A.R.E. Now, Inc. v. FAA,* 844 F.2d 1569 (11th Cir.1988); *Sierra Club v. United States Dept. of Transportation,* 753 F.2d 120 (D.C.Cir.1985). As the D.C. Circuit has explained:

14. The Corps relied on the mitigation plan and other conditions in determining that the Project was eligible for consideration under GP 38 because it caused only minimal adverse environmental effects. Were it not for this determination, the Corps would have had to repermit the Project under section 404 and at that point determine whether an EIS would be necessary as part of the individual permitting process or whether an EA would suffice. In either case, the Project would not be able to proceed until either an EA or an EIS had been performed.

The Corps argues that if the decision to issue authorization under GP 38 was correct, NEPA need not apply by definition. GP 38 can only apply if the action authorized will cause only minimal adverse effects. 33 U.S.C. § 1344(e). NEPA applies to major federal actions which significantly affect the quality of human life. Defendant argues that if the finding of minimal adverse effect was correct, and authorization under GP 38 was proper, there can be no significant impact to the human environment caused by the same action and NEPA does not apply. Thus, defendant argues that its decision to authorize the Project under GP 38 should be reviewed under the criteria imposed by GP 38 and not NEPA.

Although a similar threshold finding is required to avoid the need for an EA/EIS under NEPA and to issue a permit under GP 38, there are different procedural requirements and responsibilities under each. The decision to issue this permit under GP 38 will be examined under both the requirements of NEPA and the terms and conditions of GP 38.

NEPA's EIS requirement is governed by the rule of reason, and an EIS must be prepared only when significant environmental impacts will occur as a result of the proposed action. If, however the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required. To require an EIS in such circumstances would trivialize NEPA and would "diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment."

*Cabinet Mountains, supra* at 682 (citations omitted).

The Second Circuit, in reviewing a challenge to another hydroelectric project, recently discussed the role of mitigation measures in supporting an agency's FONSI:

[W]e conclude that FERC took the requisite "hard look" at the environmental impact of the [project]. It examined the Project's impact on the aesthetic, cultural, historical, and recreational aspects of the site; it considered inconsistencies with state environmental plans; and it proposed measures to minimize certain unavoidable environmental impacts. Under these circumstances, given that FERC's findings regarding the adequacy of mitigation measures are supported by substantial evidence, FERC has "convincingly documented" its finding of no significant impact.

*Friends of the Ompompanoosuc v. FERC,* 968 F.2d 1549, 1556–67 (2d Cir.1992). As long as the adequacy of mitigation measures are clearly supported, *Ompompanoosuc* strongly suggests that the Second Circuit joins the majority of courts in finding it proper for an agency to consider mitigation plans in determining the significance of the environmental impact of an action.

In the present case, the Corps was not engaged in the process of determining whether or not the Project would signifi-cantly impact the human environment. Rather, it was engaged in determining whether the Project was below the threshold imposed by GP 38, i.e., whether it caused minimal or no adverse impact. In either case, the use of mitigation plans to reach such a finding is acceptable, even though the CEQ recommends against it. As in *Ompompanoosuc*, there is substantial evidence that the mitigation plans will adequately minimize any adverse environmental impacts. *See, supra* n. 9. As such, the authorization and its mandatory conditions were properly issued under GP 38. While a court may disagree with the final result, its review under NEPA is to insure that its procedural requirements have been followed and that the agency involved has taken the requisite "hard look" at the environmental impact of the action. *See, Ompompanoosuc, supra* at 1556–57 ("[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to ensure that the agency has considered the environmental consequences.") (quoting *Stryker's Bay Neighborhood Council, Inc. v. Carlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980). The record here is replete with indications that the Corps did in fact take the necessary "hard look." *See,* AR 60, 64–66, 69–72, 74, 78, 79, 82, 87 and 92–94.

For these reasons, the Corps' finding that the Project, as conditioned by the mitigation plan, caused minimal adverse environmental effect was not arbitrary or capricious nor an abuse of discretion and an EIS under NEPA was not necessary.

### b. Historic Resources

Plaintiffs claim that in making its determination of only minimal adverse impact the Corps did not give adequate consideration to the impact on historical resources at the Project site as required by NEPA, 40 C.F.R. § 1508.27(b)(3), (8). Plaintiffs recognize that the FERC license and the mitigation plan provide for consultation about the future of any historic sites but plaintiffs take issue with them because they make no explicit commitment to avoiding losses. Because any losses of historic resources would be significant, plaintiffs

argue that an EIS is required before the Project can continue.

Again, the court would point to the administrative record in finding that the Corps did consider the impact of the Project on any historic sites in making its determination and giving its approval under GP 38 to the Village. (AR 112, 122–126, 128, 129, 130, 131). Moreover, the authorization was conditioned to mitigate the impact on historical and cultural resources. Condition 7 of the authorization provides:

> Upon completion of the monitoring of the mitigation area, a determination shall be made by the Corps as to whether or not any manipulation (i.e. grading or excavation) or inundation/flooding of the site will be required to accomplish the mitigation. Should site manipulation or inundation/flooding be necessary, a Phase I archaeological study (and, if determined necessary by the Corps and the Vt. [State Historical Preservation Officer] SHPO, a Phase II study) shall be conducted to determine if the area contains any resources of cultural significance. These studies shall be commenced within two months after a determination that manipulation or inundation/flooding is necessary. A report documenting the results of these studies shall be submitted to the Corps and the Vt. SHPO so that a determination of the effect may be made within three months after completion of the studies. Should the Corps, the Vt. SHPO and the Advisory Council on Historic Preservation determine that mitigation in way of avoidance or data recovery be necessary, this shall be accomplished before work can commence on the site.

AR 132. Accordingly the Corps addressed the issue of potential losses of historic resources by requiring participation of the appropriate state and federal agencies and also requiring avoidance or data recovery as necessary. The mitigation plan addresses the impact on historical sites adequately and therefore, as concluded above, the Corps did not act arbitrarily or capriciously in deciding an EIS was not necessary.

#### c. FERC Environmental Assessment

■ Plaintiffs assert that the Corps improperly relied on the FERC EA in granting authorization under GP 38 and was required to conduct its own EA and EIS. FERC is the lead agency for the Project. Pursuant to NEPA, it conducted an EA and subsequently reached a FONSI in regards to the Village's original application. (AR 105) When the Village applied to amend its license, the FERC found that the impacts of the Project would be diminished by the reduction in size of the Project and granted an amended license. (AR 106).

As discussed previously, in accordance with NEPA the Corps has promulgated their own regulations for implementing NEPA. See, 33 C.F.R. §§ 230, 325. Both those regulations and the regulations promulgated by the CEQ allow for the adoption of another agency's EIS or EA/FONSI by the Corps. See, 33 C.F.R. § 230.21; 40 C.F.R. § 1506.3(a). The Corps may consider another agency's EIS or EA/FONSI adequate "unless the district commander finds substantial doubt as to technical or procedural adequacy or omission of factors important to the Corps decision." 33 C.F.R. § 230.21.

Plaintiffs' claim is contrary to the regulations and again seems to be based on the preliminary statements of Corps employees who implied that the FERC EA was inadequate. (AR 14, 54). Plaintiffs do not challenge the FERC EA, only the Corps' reliance on it. But the regulations specifically allow the Corps to rely on another agency's EA/FONSI. Where the district commander found no substantial doubt as to the FERC EA/FONSI nor omission of important factors, the Corps has not violated the procedure of NEPA by relying on it to authorize the Project under GP 38.

#### d. Notice

Plaintiffs' final NEPA related claim alleges that the Corps was required to provide public notice of its intent not to perform an EIS prior to issuance of the July 15, 1992 authorization. Plaintiffs cite several Second Circuit decisions—*Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir.1972), *Cross–Sound Ferry Service, Inc. v. Unit-*

*ed States,* 573 F.2d 725 (2d Cir.1978) and *WATCH v. Harris,* 603 F.2d 310 (2d Cir. 1979)—to support their claim. However, these cases held "that the agency 'must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision'" as to whether an EIS was required. *WATCH, supra* at 326 n. 36, quoting *Hanly, supra* at 836.

As discussed above, the Corps *did* provide the required notice and opportunity to be heard prior to its initial issuance of GP 38 in 1982 and to its reissue in 1987. (AR 146). It also published an EA and a statement of findings explaining its decision that GP 38 did not have a significant impact on the human environment.

■■■ As for the recent authorization granted the Project, Corps regulations provide that after a regional permit is issued in "compliance with the other procedures of this regulation ... individual activities falling within those categories that are authorized by such regional permits do not have to be further authorized by the procedures of this regulation." 33 C.F.R. § 325.2(e)(2). Therefore, once the Corps determined that the Project was within the scope of GP 38, the Project was no longer subject to the Corps regulations implement-

ing NEPA.[15] Thus, notice of the Project's authorization under GP 38 was not necessary.

It is only when an agency is required to conduct an EA or an EIS that it is required to give public notice of the proposed action and provide an opportunity for public comment. The Corps was not required to conduct an EA or an EIS for the Village's permit application and so the notice obligation discussed in *WATCH* never attached. Plaintiffs' claim fails.

### 3. Claim III—The Mitigation Plan Requires an Individual § 404 Permit

Plaintiffs claim that the creation of the compensatory wetlands required by the Special Conditions attached to the authorization granted the Project[16] will encompass a "discharge" into "navigable waters" within the meaning of section 404 of the CWA, 33 U.S.C. § 1344 and requires the Corps to issue a permit. *See, U.S. v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 123, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1985). Because the Corps' own regulations require that all permits reasonably related to the same activity be applied for in the same application[17], plaintiffs assert that until the alleged "discharge" created by the mitigation plan is permitted under

15. This, of course, is consistent with the concept of the general permit under which the FERC conducted an EA and the Corps imposed additional mitigation requirements.

16. The creation of the compensatory wetlands required by the Corps may take place in several ways. The first method is completely natural. That is, the mitigation sites which must be acquired by the Village may turn into wetlands on their own. This possibility exists because the sites chosen were originally wetlands but were drained for cultivation purposes. With the cessation of farming activity required by Special Condition 2 the Village believes there is a strong possibility that the sites will return to wetlands naturally.

The second possibility envisions the need, determined after a two-year monitoring period of the mitigation sites, for manipulation or inundation/flooding in order to accomplish the mitigation. This course of action would be subject to Corps review and approval as to the extent of the manipulation necessary and the feasibility of the site for mitigation. Manipulation would also be subject to Special Condition 7's require-

ments for protecting cultural and historical resources at the site.

The third possibility envisions the failure, determined by the Corps after the completion of a five-year monitoring plan, of the mitigation sites acquired by the Village to provide adequate compensatory wetlands. If that becomes the case, the Village is required to prepare a supplemental mitigation site and proposal subject to Corps approval. The special conditions of the permit will then be amended to ensure adequate compensation for the impact on wetlands via the supplemental mitigation site or sites.

17. Plaintiffs cite 33 C.F.R. § 325.1(d)(2) which provides:

All activities which the applicant plans to undertake which are reasonably related to the same project and for which the DA [Department of the Army] permit would be required should be included in the same permit application. District engineers should reject as incomplete, any permit application which fails to comply with this requirement.

section 404, the Project application for authorization under GP 38 is incomplete and the Project should be enjoined until the application is completed.

■ Section 404 of the CWA, 33 U.S.C. § 1344, requires a permit to be issued for "the discharge of dredged or fill material into the navigable waters at specified disposal sites." "Navigable waters" is defined as "the waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7), which in turn are defined by Corps regulations to include wetlands, 33 C.F.R. § 328.3(a). The courts have interpreted the CWA as including both natural and artificial wetlands. *See, Leslie Salt Co. v. U.S.,* 896 F.2d 354 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1089, 112 L.Ed.2d 1194 (1991); *U.S. v. Akers,* 651 F.Supp. 320 (E.D.Cal.1987). Thus, discharge of dredged or fill material into a river or wetland, natural or man-made, would require a permit under Section 404.

Plaintiffs' argument rests on several faulty assumptions. The first is that manipulation or flooding will be necessary to create the wetlands. As mentioned above, it is quite possible that the mitigation sites [18] will revert to their original form as wetlands once farming activities cease. If this is the case, the Corps would have no procedural responsibilities to fulfill under the CWA.

■ If it does become necessary to successfully complete the mitigation by flooding it is not contemplated that this will result in a "discharge" into the Mississquoi within the meaning of section 404 of the CWA. Rather, mitigation will likely be accomplished by diverting water from the river itself to the sites (a fact plaintiffs acknowledge in their pretrial brief). The

definition of "discharge" is defined to include "discharge of pollutants," 33 U.S.C. § 1362(16), which is in turn defined to include dredged spoil, solid waste, sewage, rock, sand and agricultural waste, among other things. 33 U.S.C. § 1362(6). Thus if creation of the wetlands occurs by flooding the mitigation sites with waters from the Mississquoi, nothing included in the definition of pollutants will be discharged into the Mississquoi as a result.

Plaintiffs also mistakenly assume that the mitigation sites currently proposed constitute "waters of the United States" and that any flooding of the mitigation sites will therefore constitute a discharge into "waters of the United States," requiring a section 404 permit. At present the mitigation sites do not constitute "waters of the United States" under the definitions of the CWA, 33 U.S.C. § 1362, or those of the Corps regulations, 33 C.F.R. § 328.3. Until the mitigation sites are determined to constitute "waters of the United States," the provisions of section 404 cannot apply and no permit is required.

■ Plaintiffs' final flawed assumption is that the regulation requires the Corps to issue a permit for a discharge of which might occur at some future date at the same time as issuing authorization under GP 38. It does not. The regulation requires that all "activities that the applicant *plans to undertake"* be included in the same *permit application.* 33 C.F.R. § 325.1(d)(2). There are no current plans to discharge any fill or dredged material into "waters of the United States" [19] because no such discharges appear necessary. Should such plans arise, the Village will be required to obtain a permit, or failing that, provide alternate mitigation. An individual

---

**18.** The mitigation sites at present are two parcels of land, the Bigelow" and "cornfield" mitigation sites, which constitute thirty acres of land near the Mississquoi River. (AR 132).

**19.** Special condition 22 requires the Village to prepare and submit an erosion control plan in regard to the riverbanks within the impoundment area. This condition is the only one which anticipates the possibility of the discharge of fill into "waters of the United States" due to proposed measures of an erosion control

plan. This potential discharge is unrelated to the creation of the mitigation sites. SC 22 requires that individual permit applications be submitted for such measures and prohibits any such discharge until written approval has been received from the Corps. The Village did not plan on undertaking this activity; rather, it was imposed upon them by the Corps and therefore was not possible to be included in the same permit application as required by 33 C.F.R. § 325.1(d)(2).

section 404 permit is accordingly not required and plaintiffs' claim fails.

### 4. Claim IV—Project is outside the scope of GP 38

Plaintiffs claim that the Project is ineligible for authorization under GP 38 because it entails adverse impacts to the natural and cultural environment which are more than the minimal impacts allowed under GP 38. They also allege that the Project is likely to require the filling of wetlands in violation of GP 38.

The substance of plaintiffs' claim here is the same as that addressed earlier in connection with NEPA and the Corps determination that the Project caused minimal or no adverse impacts. The Corps has addressed the cultural and environmental impacts of the Project and determined that, as conditioned, the Project will cause minimal adverse environmental and cultural impacts and authorization under GP 38 is appropriate.[20] That determination was not arbitrary or capricious nor was it an abuse of discretion.

██ When GP 38 was extended in 1987 in contained 6 Special Conditions. Special condition 4 declared that "[n]o permanent or temporary fill shall be deposited in wetlands under this permit." If plaintiffs' claim is correct that wetlands will be filled as a result of the Corps' authorization, and it's not clear that it is [21], the Project would clearly be in violation of the terms of GP 38. This possibility does not place the Project outside the scope of GP 38 but subjects its permit to possible revocation. Plaintiffs' claim fails.

### 5. Claim V—The July 15 Authorization Violated the NHPA

Plaintiffs claim that the Corps committed two violations of the NHPA by 1) failing to determine the effects of the approval on any historic property as required by Section 106 of the NHPA and 2) failing to give notice to interested parties prior to granting authorization for the Project. Plaintiffs request that all action at the Project be enjoined until the Corps complies with these provisions of the NHPA.

The "NHPA require[s] only that agencies acquire information before acting." *Connecticut Trust for Historic Preservation v. I.C.C.*, 841 F.2d 479 (2d Cir.1988). Section 106 of the NHPA seeks to implement this by requiring that all agencies "having authority to license any undertaking shall ... prior to the issuance of any license ... take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or is eligible for inclusion in the National Register." 16 U.S.C. § 470f.

Regulations describe the methods by which Section 106 review is to be conducted. *See generally,* 36 C.F.R. § 800. When the effect of the proposed action is adverse, the agency is required to notify the Advisory Council on Historic Preservation ("Council") and consult with the SHPO "to seek ways to avoid or reduce the effects on historic properties." 36 C.F.R. § 800.5(e). The agency is also required to involve "interested persons" as consulting parties when they so request. § 800.5(e)(1). Interested persons include "the representative of an Indian tribe." § 800.5(e)(1)(ii). The NHPA defines Indian tribe as "the governing body of any Indian tribe, band, nation, or other group that is recognized as an Indian tribe by the Secretary of the Interior...." § 800.2(g).

██ As an initial matter, under the terms of the statute, none of the plaintiffs qualify as "interested persons." It is undisputed that no plaintiff is formally recog-

---

**20.** Perhaps what makes this such a bitter pill for plaintiffs to swallow is the preliminary indication by the New England Corps Division that the Project would not be eligible for authorization under GP 38 but would be subject to an individual § 404 permitting process instead. AR 24. However, as discussed above, that decision was not the final decision and did not bind the Corps.

**21.** Plaintiffs cite a telephone conversation record between the Corps project manager and a representative of the Village discussing the possibility of the need for fills to allow the contractor access in the event of warmer weather and the inability to rely on frozen ground or snow roads for access. (AR 37).

nized by the Secretary of the Interior as an Indian Tribe. A list of recognized tribes was published in the 1988 Federal Register, 53 Fed.Reg. no. 250, p. 52829, *et seq.* (12/29/88) and plaintiffs were not included. Nor have they been added to the list since that time. Declaration of Holly Reckord, Acting Chief, Branch of Acknowledgment and Research, Bureau of Indian Affairs. Whether plaintiffs are an "Indian tribe" for other purposes (such as the receipt of benefits from other federal or state agencies) does not bear on their rights under the NHPA. As such, the plaintiffs are not "interested parties" by the terms of the statute and were not entitled to participate as consulting parties, § 800.5(e)(1), nor were they entitled to receive documents produced under a Section 106 review. § 800.5(e)(2).

■ As members of the public though, the plaintiffs were entitled to "an adequate opportunity to receive information and express their views." § 800.5(e)(3). The record shows that the Corps met with the plaintiffs Hilda Robtoy and Dee Brightstar on November 6, 1991, AR 21, and with Robtoy, Brightstar and John Moody on December 17, 1991, AR 31, in their representative capacity for the Abenaki Nation of the Mississquoi to discuss their concerns and the Project's impact on prehistoric cultural resources. The Corps provided "adequate opportunity" for the plaintiffs to receive information and express their views and as such did not violate any of the notice provisions of the NHPA.

As to whether or not the Corps adequately considered the effects of the Project on any historical sites, the analysis is not so straightforward. In issuing a license to the Village for the Project, the FERC was required to insure that the NHPA requirements were met. FERC made a finding of no adverse effect on the inundation site based on a mitigation plan that mandated avoidance and mitigation of impacts to the area. AR 108 at p. 8. Both the SHPO and the Council concurred. As to this finding, the Corps was obligated to accept the lead agency's finding. 33 C.F.R. Part 325, App. C(2)(c). Moreover, it appears that plaintiffs are not challenging this finding, as FERC is not named as a defendant in this action.

■ Where the analysis becomes more involved is in relation to the mitigation site.[22] The plaintiffs claim that the historic resources at the mitigation site were not adequately considered by the FERC license nor by the Corps authorization. Review here is limited to whether the Corps complied with the procedural requirements of the NHPA and acquired adequate information concerning the historic resources at the site and sought "ways to avoid or reduce the effects" of the Project.

The record and the conditions attached to the authorization make it clear that the Corps did indeed satisfy these requirements. In addition to meeting with plaintiffs several times, the Corps consulted with the SHPO concerning the Project's impact on historical resources, (AR 87 and 94), and both are in agreement as to how the possible adverse effects should be mitigated if any historic properties are discovered. Moreover, the conditions attached to the authorization adopt the recommendations of the SHPO, *see,* Affidavit of Martha Abair, Corps Project manager, Defendant's Exhibit A, and set out concrete steps to be

---

22. For its part, the Corps argues that the mitigation site is distinct from the impoundment site and that it, unlike the impoundment site, has not yet been deemed eligible for the National Register and is therefore not within the confines of the NHPA. In addition, the Corps argues that even if the mitigation site is subject to the NHPA, the procedural requirements of the NHPA do not apply because GP 38 and the authorization for the Project have both taken into consideration the effect of the undertaking on historic property, thus satisfying the goals of Section 106. The Corps points to the conditions which set strict conditions on the manipulation of the mitigation site if it becomes necessary, AR 132, Special Condition 7, and the endorsement of the SHPO of these conditions as a satisfactory means of complying with NHPA. *See, e.g., Walsh v. U.S. Army Corps of Engineers,* 757 F.Supp. 781, 789 (W.D.Tex.1990) ("Given the special conditions imposed by [the permit], the Court finds no violation of NHPA or 36 C.F.R. Part 800"). For the purpose of this analysis, we will assume that the mitigation site is subject to the procedural requirements of the NHPA.

followed if any historical resources are discovered at the mitigation site. AR 132.

Procedurally the Corps is in technical violation of the NHPA due to its failure to prepare a Memorandum of Agreement ("MoA") between the SHPO and itself concerning how the effects of the Project will be taken into account. 36 C.F.R. § 800.-5(e)(4). However, this violation is not fatal, given the NHPA's permission that its regulations "may be implemented in a flexible manner." § 800.3(b). While the NHPA requires mutual agreements between the CORPS and SHPO to be executed in a MoA, the Corps' regulations require such agreements to be formalized either through an MoA or through permit conditioning. 33 C.F.R. Part 325, App. C(9). The Corps and the SHPO have taken this latter path and given the flexibility allowed by the NHPA itself and that the conditioned permit fulfills the goals of the NHPA, the Corp's failure to execute an MoA is insufficient to hold it has violated the NHPA.

### 6. Claim VI—NAGPRA violation

Plaintiffs' final claim is made under NAGPRA, 25 U.S.C. § 3005(a)(4).[23] Plaintiffs claim that because the mitigation plan leaves the fate of the remains and artifacts which may be unearthed in the hands of the Corps, the State and the Village, it violates NAGPRA and is unlawful. Prior to reaching the merits of plaintiffs' claim, several definitional hurdles must be cleared.

NAGPRA defines Indian tribe as follows: "Indian tribe" means any tribe, band, nation, or other organized group or community of Indians, including any Alaska Native village ... which is recognized as eligible for the special programs and services by the United States to Indians because of their status as Indians. 25 U.S.C. § 3001(7). As discussed earlier, it is undisputed that the Abenaki Nation of Mississquoi is not an "Indian tribe" recognized by the Secretary of the Interior. Nonetheless, that plaintiff contends that for purposes of NAGPRA it does constitute an Indian tribe, citing its receipt of federal funds and a recent decision by the Vermont Supreme Court.[24]

Plaintiff's argument that it does indeed constitute an Indian tribe may have practical merit as to the receipt of federal funds but appears to be stretching the *Elliot* decision rather thin. In any event, the merits of those arguments need not be addressed here because the language of NAGPRA includes "organized group or community of Indians ... eligible for the special programs and services provided by the United States to Indians because of their status as Indians." The regulation which sets out the procedures for establishing that an American Indian group exists as an Indian tribe, 25 C.F.R. § 83 (1992), defines Indian group or group to mean "any Indian aggregation within the continental United States that the Secretary of the Interior does not acknowledge to be an Indian tribe." The Abenaki Nation of Mississquoi falls squarely within this definition and the fact that it receives funds and assistance from the United States because of its members status as Indians includes it within the class protected by NAGPRA.

NAGPRA applies to the disposition of Native American cultural items that are "excavated or discovered on federal or tribal lands." 25 U.S.C. § 3002(a). Federal lands are defined in relevant part as "land other than tribal lands which are controlled

---

**23.** "Where cultural affiliation of Native American human remains and funerary objects has not been established in an inventory prepared pursuant to section 3003 of this title or the summary pursuant to section 3004 of this title, or where Native American human remains and funerary objects are not included upon any such inventory, then, upon request and pursuant to subsections (b) and (e) of this section and, in the case of unassociated funerary objects, subsection (c) of this section, such native American human remains and funer-

ary objects shall be expeditiously returned where the requesting Indian tribe or native Hawaiian organization can show cultural affiliation by a preponderance of the evidence based upon geographical, kinship, biological, archaeological, linguistic, folkloric, oral traditional historical, or other relevant information or expert opinion.

**24.** *State of Vermont v. Raleigh Elliott et al.,* — Vt. —, 616 A.2d 210 (1992).

or owned by the United States." § 3001(5). Plaintiffs urge a broad construction of "control" to include the Corps' regulatory powers under the CWA and its involvement in devising and supervising the mitigation plan.

Such a broad reading is not consistent with the statute, which exhibits no intent to apply the Act to situations where federal involvement is limited as it is here to the issuance of a permit.[25] To adopt such a broad reading of the Act would invoke its provisions whenever the government issued permits or provided federal funding pursuant to statutory obligations.

As yet there have been no cultural or funerary items discovered at the mitigation site, though the possibility of their existence is extremely high. However, NAGPRA applies to cultural and funerary objects already possessed or under the control of a Federal agency or museum, § 3003 and § 3004, or those already discovered or excavated, § 3002. As to plaintiffs' claim, the court must hold that even if NAGPRA were to apply, which it does not, the claim is premature.[26]

IV. *Conclusion*

On the basis of the foregoing discussion the court holds that the Plaintiffs have failed to sustain any of the claims pled and accordingly the Defendants are entitled to judgement as a matter of law. The July 15, 1992 conditioned authorization of the Corps of Engineers to the Village of Swanton to raise the spillway of the Orman Croft Generating Station is affirmed.

---

**25.** The legislative history of the statute repeatedly uses the language "federal lands." *See* 1990 U.S.Code Cong. & Admin.News at 4367–4392.

**26.** Plaintiffs' claim based on common law and property rights appears to be subsumed by the NAGPRA claim. Its violation of fiduciary duty claim is extremely nebulous and rehashes arguments that have been previously addressed. It is enough to note that though a general fiducia-ry duty may be owed to the plaintiffs by the government, "a general fiduciary relationship does not mean that any and every claim by [an Indian] necessarily states a proper claim for breach of the trust...." *Pawnee v. U.S.A.,* 830 F.2d 187, 191 (Fed.Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988).