NATIONAL AUDUBON SOCIETY, Sierra Club, The Wilderness Society, Conservation Law Foundation, Inc., Vermont Audubon Council, Restore; The North Woods, Preserve Appalachian Wilderness, Green Mountain Forest Watch, James Northup, Ellen Kingsbury Viereck, Tyler Resch, and Mathew Jacobson

v.

Terry HOFFMAN, Forest Supervisor of the Green Mountain National Forest, James Bartelme, Forest Supervisor of the Green Mountain National Forest, and Floyd "Butch" Marita, Regional Forester, in their official capacities as employees of the U.S.D.A. Forest Service.

Civil No. 1:94CV160.

United States District Court,
D. Vermont.

Dec. 13, 1995.

File Line as Corrected Jan. 11, 1996.

282

Stephen L. Saltonstall, Bennington, VT, for plaintiffs.

Helen M. Toor, Assistant U.S. Attorney, Burlington, VT, for defendants.

*RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT*

MURTHA, Chief Judge.

The plaintiffs, a coalition of conservation organizations and environmentalists, bring this action against several employees of the United States Forest Service pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–14. The plaintiffs challenge the Forest Service's decision to extend a road and conduct logging operations in an area of the Green Mountain National Forest known as the Lamb Brook Area (hereinafter "Lamb Brook").[1] For the reasons set forth below, each pending Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

Each party moving for summary judgment has an initial burden of informing the Court of the basis for its motion and of identifying those parts of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Latimer v. Smithkline and French Laboratories*, 919 F.2d 301, 303 (5th Cir.1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Where a motion for summary judgment is supported by affidavits or other documentary evidence, the party opposing that motion must set forth specific facts which show there is a genuine, material issue for trial. *See King Service, Inc. v. Gulf Oil Corp.*, 834 F.2d 290, 295 (2d Cir.1987). Accordingly, for an opposing party to resist entry of summary judgment, it must come forward with enough evidence to support a verdict in its favor. It cannot defeat a properly supported motion merely by presenting metaphysical doubt, conjecture or surmise concerning the facts. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Borthwick v. First Georgetown Securities, Inc.*, 892 F.2d 178, 181 (2d Cir.1989). Only disputes over facts which might affect the outcome of the suit under the governing law preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

---

1. Plaintiffs' Second Amended Complaint purports to state three causes of action based upon alleged violations of NEPA (count one), NFMA (count two) and the Administrative Procedure Act ("APA") (count three). While neither NEPA nor NFMA explicitly provide for review, the plaintiffs are able to pursue their claims pursuant to the APA, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see Sierra Club v. Marita*, 46 F.3d 606, 610 n. 3 (7th Cir.1995); *Sierra Club v. United States Army Corps of Engineers*, 772 F.2d 1043, 1050 (2d Cir.1985).

Upon review of the submissions of the parties, the Court finds the following facts undisputed. Lamb Brook is a 5,561 acre portion of the Green Mountain National Forest located in Bennington and Windham Counties, Vermont. The project at issue is designed to implement the Green Mount National Forest Land and Resource Management Plan (hereinafter the "Forest Plan") issued pursuant to the NFMA in 1987.

The Forest Plan sets forth a variety of specific management goals and strategies for distinct areas of the Green Mountain National Forest, including Lamb Brook. Under the Forest Plan, Lamb Brook is designated as consisting of two management areas, Management Area 3.1 and 2.1A. Over 80% of Lamb Brook is Management Area 3.1.

The Forest Plan describes Management Area 3.1 as follows:

MANAGEMENT PRESCRIPTION 3.1 emphasizes a MOSAIC OF VEGETATIVE CONDITIONS in a roaded, intensively managed, but natural appearing environment. A careful blend of timber stands of various types and ages will benefit diversity, certain wildlife species, roaded recreational experiences and visual quality. Practicing even-aged silviculture for high quality sawtimber fits well with these objectives and will be used to help achieve them.

Visitors will find abundant opportunities to drive and walk in the forest which will gradually grow back to stands of large trees. Many different wildlife species will benefit from the food and cover which occur as the vegetation changes from grasses to shrubs to saplings to poles and back to large trees. This pattern of vegetative conditions across the landscape will be visually attractive to people visiting the forest.

Forest Plan at 4.102.

In addition, the Plan describes Management Area 2.1A as follows:

MANAGEMENT PRESCRIPTION 2.1A emphasizes CONTINUOUS FOREST COVER and roaded natural recreation opportunities. This prescription provides areas having trees of many ages and sizes, where no large clearings will be created. This management prescription intends to help maintain a balanced mosaic of ecological communities across the forest; to help us learn more about the benefits and costs of uneven-aged management and reduce soil and nutrient loss on sensitive lands, such as riparian areas.

Forest Plan at 4.93.

Accordingly, the Forest Plan contemplates intensive land management, timber harvesting and recreational uses in areas such as Lamb Brook.

In January 1993, the Forest Service issued an Environmental Assessment (hereinafter the "EA") in which it sets forth its proposals for implementing the Forest Plan at Lamb Brook. The EA's enumerated goals include: (1) To stimulate the development of northern hardwood and spruce regeneration; (2) to develop an even-aged stand structure; (3) to improve the growth and quality of residual crop trees; (4) to regenerate aspen and improve area wildlife habitat; (5) to create 36 acres of permanent wildlife openings to provide needed grasses and shrubs for wildlife forage; (6) to improve the abundance and quality of wildlife food and cover; (7) to upgrade Forest Road 266 (hereinafter "FR266") for hauling timber products in winter; (8) to make road improvements necessary to transport timber products; and, (9) to manage FR266 with seasonal closures. *See generally* EA at 4–6. To realize these goals, the EA sets forth several alternative courses of action, including a "No Action Alternative" and "Alternative E."

On February 9, 1993, the Forest Service issued its Decision Notice (hereinafter "DN") and a Finding of No Significant Impact (hereinafter "FONSI"). The DN reiterates the EA's stated purpose of the Lamb Brook project:

The Forest Plan was approved by the Regional Forester in January 1987. The Lamb Brook Area EA is tiered [sic] to the Forest Plan Environmental Impact Statement. The Lamb Brook Area projects are an important step in implementing the goals and objectives of the Forest Plan. A comparison between the existing conditions and the Forest Plan's desired future

condition shows a need to improve vegetative diversity by moving the area toward a more desirable mix of tree species, ages, and sizes. There is a need to protect the Old Stage Road, a historic cultural resource, and at the same time, maintain recreational opportunities via the corridor snowmobile trail system. There is also a need to manage access in order to protect resources, wildlife, and control vandalism. All actions approved by this decision will move affected lands toward the desired future condition described in the Forest Plan.

*See* DN–1 to DN–2.

To accomplish this stated purpose, the Forest Service plans to implement Alternative E. Under Alternative E, the Forest Service "will treat 1,239½ acres of National Forest land" and over 300 acres of trees will be "harvested." *See* DN–2. It is difficult to compute the precise impact of this "harvesting" using the defendants' figures. However, plaintiffs estimate that this Forest Plan actually envisions the cutting of approximately 3.2 million board feet of timber from Lamb Brook. Throughout agency documents, these clearcutting activities are euphemistically referred to as the "standard" or "delayed shelterwood method" of "vegetation" or "even-aged management." *See* DN–2.

The Forest Service also intends to upgrade and extend by approximately one and one-third miles FR266. The DN describes the extension as a "low standard, graveled intermittent use road." *See* DN–3. It is the plaintiffs' objection to these proposals which form the basis of the instant dispute.

The plaintiffs allege implementation of Alternative E will have a significant, deleterious impact on Lamb Brook's black bear population. Since the existing portion of FR266 already passes through bear habitat, the plaintiffs fear additional human activity caused by its extension will disrupt the bears feeding and mating habits. They also argue that extension of FR266 will encourage increased use by snowmobiles and illegal use by other all terrain vehicles ("ATV"). *See generally* Declarations of Mathew Jacobson, Kelly Kahler, and Kenneth D. Butcher (attached as exhibits to paper 51).

The Forest Service has simultaneously admitted and minimized the extent of illegal ATV use of FR266. *Compare* EA at 39 ("[S]ome unauthorized use of the road and trails by off-highway vehicles is occurring.") *with* EA at 42 ("Unauthorized use by all-terrain vehicles is occurring along FR266 . . . [and] would likely increase in the Proposed Action. . . .") *with* Declaration of Michael Schrotz (appended to paper 58) at para. 5 ("[I]t is possible that those ATVs or the ATV trails observed in the dirt were authorized vehicles.") However, the Forest Service unequivocally has admitted its activities will disrupt the black bear habitat. *See* EA at 42, 46.

The EA notes that black bears are sensitive to human disturbance and may be "negatively impacted by increased human presence and loss of remoteness." EA at 42. The Forest Service further admits "any additional road building within a bear sub-unit could potentially reduce the carrying capacity of the sub-unit and lower the productivity of the local bear population." EA at 47. In addition, the Service recognizes that "[b]ears show a high fidelity to [certain] trees and return to feed on them year after year," that "[t]he abundance and availability of fall foods such as beech nuts can determine the breeding success of female bears," and that "[d]isturbing female bears during the critical fall feeding period could jeopardize their reproductive success." EA at 42, 47.

However, the Forest Service has concluded the anticipated increased human presence as a result of the extension and increased use of FR266 will not significantly impact Lamb Brook's black bears. Alternative E places a number of limitations on the use of FR266 which are designed to deal with bear disruption and ATV use. According to the Forest Service, the FR266 road extension will be temporary and vehicles using the road will be restricted to winter use. *See* DN–3 to DN–7; EA at 23–24.

The Forest Service's proposal also has several mitigation measures designed to ameliorate the impacts about which the plaintiffs complain. Mitigation Measure J limits construction of the extension of FR266 to the

period between June 15 and September 1. Mitigation Measure K addresses illegal ATV use by specifying that the Forest Service will attempt to obliterate a section of the road to give the illusion that it has not been extended and is impassable. Mitigation Measure L provides that beech trees which show evidence of recent bear use will not be cut, thereby preserving bear feeding areas. *See* DN–5. Lastly, Mitigation Measure B provides that timber harvesting will only occur in winter months when bears are likely to be hibernating. *See* DN–3 to DN–4.

However, upon examination, the administrative record contains contradictory statements concerning the extension to FR266. For example, the EA describes the Forest Service plans as follows:

* Place gravel on the eastern 1⅓ miles of FR266. Construct approximately 1⅓ miles of low standard, gravelled [sic] intermittent use road from the end of FR266 northeast into Compartment 123, Stand 25. These improvements are necessary to transport timber products. The section of new intermittent use road would be closed to the general public to all but foot traffic during logging operations and upon completion of the timber sale. Hauling would occur only on frozen ground.

* Manage FR266 with seasonal closures. The lower two miles of FR266 from Route 100 to the upper closure (the point where construction of the intermittent use road is proposed to begin) would be opened for vehicle access after spring breakup and would remain open during the summer and fall. It would be closed to vehicle traffic following deer hunting season and remain closed to all but foot traffic and snowmobiles during winter and spring. It would be open to snowmobiles from December 1 to March 1. All gates used for closure would allow access by wheelchairs.

EA at 5. However, the EA further explains: The proposed timber harvest, road, trail, and parking lot construction is expected to be completed within three to five years. Additional timber harvest would likely occur five to fifteen years after the first harvest to remove the residual shelterwood overstory. Cutting in future years would

have only minor short term effects on soil productivity and water quality assuming that current mitigation measures are applied.

EA at 35. Nevertheless, the defendants now claim that FR266 will not be maintained in the expectation of future use. *See* Declaration of Michael K. Schrotz at para. 10.

The plaintiffs also allege implementation of Alternative E will have a significant, deleterious impact on Lamb Brook's neotropical bird population. Again, the Forest Service's analysis is confusing. Under the plan at issue, the Forest Service will clear-cut hundreds of acres of closed-canopy mature forest habitat and convert those areas into "early successional habitats." *See* EA at 47. Admittedly, the openings created by the early successional habitat will change Lamb Brook in that it is designed to provide wildlife with an opportunity to exploit a habitat type that currently does not currently exist in the Lamb Brook area.

The plaintiffs fear the result will be a change which will subject Lamb Brook's neotropical migratory birds to predators who inhabit the boundaries of forest clearings, an effect known as the "edge effect." In response, the Forest Service summarily notes that these new "early successional habitats" will not substantially affect neotropical birds because Lamb Brook will remain predominantly forested. *See* DN–11; EA at 39–40.

Lastly, because a major portion of the Forest Service's proposed actions will occur in the Town of Readsboro, the plaintiffs argue the Forest Service erred when it failed to consider the Readsboro Town Plan. *See* 40 C.F.R. § 1508.27(b)(10); *see also* 24 V.S.A. § 4401 *et seq.* One of the stated goals in the Readsboro Town Plan is to "[i]dentify and protect significant natural areas, locations of special educational, scientific, historical, architectural and archaeological significance, natural resources and recreational resource areas." Readsboro Town Plan at 14 (attached as Exhibit L to paper 51). The Forest Service admits that it did not consider whether its proposed action is consistent with the Town Plan. *See* Reply Memorandum (paper 55) at 21 (The

Town Plan "is not part of the administrative record...."")

## II. DISCUSSION

### A. NFMA

The NFMA requires the Forest Service to develop land and resource management plans for the maintenance and use of resources within the national forests. *See generally* 16 U.S.C. §§ 1601–04. Plaintiffs allege, *inter alia*, that the Forest Plan prohibits the type of roadbuilding which the Forest Service has proposed and requires the Service to maintain a "deep woods habitat" at Lamb Brook. *See* Second Amended Complaint at paras. 55–58.

On its face, the Forest Plan does not prohibit the type of activities planned for Lamb Brook. The DN explains:

> Providing timber for public consumption is an important secondary product of vegetation management. The primary purpose of the selection harvests of Alternative E is to improve stand structure and promote the growth of high-quality sawtimber while, at the same time, generating timber products in an environmentally sound manner.

*See* DN–7. The Forest Plan calls for this type of vegetation management. Moreover, to the extent that roads such as FR266 are recreational and not primarily built for timber removal, they are likewise permitted under the plan. *See supra* (description of Management Areas 3.1 and 2.1A).

■ The proposed actions are designed to create diversity in Lamb Brook's wildlife and vegetation. The plaintiffs have not demonstrated the proposed timber-cutting and extension of FR266 violates the 1987 Forest Plan. Therefore, defendants' Motion for Summary Judgment on Count Two of the Second Amended Complaint is GRANTED.[2]

**2.** The plaintiffs also have asked the Court to declare the initial construction of the now existing portion of FR 266 in violation of NFMA and NEPA. *See* Second Amended Complaint at paras. 54, 58. The six year statute of limitations set forth in 28 U.S.C. § 2401(a) is applicable. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir.1988); *Sierra Club v. Robertson*, 810 F.Supp.

### B. NEPA

#### 1. Statutory Framework

■ The Forest Service is required to prepare a comprehensive, site-specific environmental impact statement (hereinafter "EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). By contrast, an EA such as the one prepared in the instant case, ordinarily "is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." *Cronin v. U.S. Dept. of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990).

If after preparing an EA, the agency determines that the proposed action will not significantly affect the environment, it can forego preparing an EIS and instead may issue a FONSI. *See* 40 C.F.R. § 1508.13. Even where it initially appears that a full EIS is required, the Forest Service may instead prepare an EA, and then make its own determination of whether the proposed action will significantly impact the environment. *See* 40 C.F.R. § 1501.4(a)-(c), 1508.9. While the issue of whether a particular action will have a "significant" effect is left to the informed discretion of the agency, NEPA and regulations promulgated thereunder provide the agency with the framework within which that judgment must be made. *See Town of Orangetown v. Gorsuch*, 718 F.2d 29, 34 (2d Cir.1983), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984).

#### 2. Standard of Review

■ When reviewing an administrative decision under NEPA, the Court must examine whether the agency considered the environmental consequences of its proposed action.

1021, 1026 n. 3 (W.D.Ark.1992), *aff'd in relevant part*, 28 F.3d 753 (8th Cir.1994). The Decision Notice authorizing the initial construction of FR 266 was issued on June 13, 1984; therefore, over ten years have passed from the time of the challenged action. Accordingly, plaintiffs' claims relating to the initial construction of FR 266 are time-barred.

*See Sierra Club v. United States Army Corps of Engineers,* 772 F.2d at 1050. To facilitate this review, the agency is required to articulate the basis of its administrative action in an administrative record. *See Securities & Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 94–95, 63 S.Ct. 454, 462–63, 87 L.Ed. 626 (1943). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

██ Although the Court is not empowered to substitute its own judgment for that of the agency, such deference does not shield an agency action from a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). If an "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the Court may find its actions arbitrary and capricious. *Motor Vehicle Manufacturer's Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *accord United States v. 27.09 Acres of Land,* 760 F.Supp. 345, 350 (S.D.N.Y.1991) ("[O]bviously inadequate or bad faith analyses by an agency are not to be validated.") Unless the Court finds the agency acted arbitrarily, its decision must be upheld. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377–78, 109 S.Ct. 1851, 1861–62, 104 L.Ed.2d 377 (1989); *Hanly v. Kleindienst,* 471 F.2d 823, 830 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); 5 U.S.C. § 706(2)(A).

### 3. Application of NEPA

██ "An agency's determination not to prepare an EIS must be reasonable under the circumstances when viewed in the light of the mandatory requirements and the standard set by NEPA." *Kelley v. Selin,* 42 F.3d 1501, 1519 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 855 (1995) (citations and quotations omitted). If substantial questions are raised regarding whether the proposed action "may" have a significant effect upon the human environment, the agency must prepare an EIS. *See Foundation for North American Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1178 (9th Cir.1982); *Big Hole Ranchers Association, Inc. v. U.S. Forest Service,* 686 F.Supp. 256, 260 (D.Mont.1988). The dispositive issue, therefore, is whether the Forest Service's decision to issue a FONSI instead of preparing an EIS is arbitrary and capricious.

██ "An EIS serves two purposes: (1) to provide decision makers with enough information to aid the substantive decision whether to proceed with the project in light of its environmental consequence; and (2) to provide the public with information and an opportunity to participate in gathering information." *Big Hole Ranchers Association,* 686 F.Supp. at 260. Because the impact of its actions cannot be quantified merely in terms of dollars, often the question of whether the proposed actions of the Forest Service will have significant effect can be a close one. *See Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1319 (8th Cir.1974). Here, the magnitude of the instant proposals, as set forth in an EA totalling over 65 pages, undermines the defendants' contention that the Lamb Brook proposals are not significant.

██ The Council on Environmental Quality (hereinafter "CEQ") administers and interprets NEPA. *See Abenaki Nation of Mississquoi v. Hughes,* 805 F.Supp. 234, 241 (D.Vt.1992), *aff'd,* 990 F.2d 729 (2d Cir.1993). In relevant part, CEQ regulations define "significantly" as follows:

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Signif-

icance varies with the setting of the proposed action. . . .

(b) *Intensity.* This refers to the severity of impact. . . . The following should be considered in evaluation of intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

. . . . .

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about future considerations.

. . . . .

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for protection of the environment.

40 C.F.R. § 1508.27.

■ On the instant record, the Court finds that, had it taken the requisite "hard look" at the context and intensity of its proposal as required by the aforementioned subsections of 40 C.F.R. § 1508.27, the Forest Service would have decided to prepare an EIS. *See Marsh,* 490 U.S. at 374, 109 S.Ct. at 1859. Therefore, its failure to do so is arbitrary and capricious.

As an initial observation, the administrative record suggests the Forest Service did not fully consider the context of its proposal. Its admitted failure to consider the Readsboro Town Plan demonstrates it did not fully consider the impact of its actions on the locality in which it plans to conduct its opera-

tions. *See* 40 C.F.R. § 1508.27(a); *see also* 40 C.F.R. § 1508(b)(10).

Moreover, the EA and DN are confusing and at times seem to misrepresent the intensity of the Forest Service's proposal. According to the DN and one of the Forest Service's own affiants, the "project area is 5,561 acres, of which 1,301.5 acres (23.4%) will be affected in some way by the proposed management activities." Affidavit of John E. MacDonald, Jr. at para. 6(a) (appended to paper 23 and made part of the supplemental record by Opinion and Order (paper 39) at 26).

■ On its face, the proposed action, which includes clearcutting of over 300 acres and its admitted attendant effects such as intrusion into bear and neotropical bird habitats, is "significant" under any reasonable construction of the term. *See* 40 C.F.R. §§ 1508.27(b)(1), (4) and (9); *see also Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244, 1250 (10th Cir.1973) ("The clearcutting of the timber planned obviously will have a significant effect on the environment for many years.")

■ Nevertheless, the Forest Service relies on the fact that the administrative record demonstrates its consideration of the issues about which the plaintiffs complain. However, NEPA requires an agency to not only acknowledge these issues, but also to provide a statement of reasons which demonstrates that it took a "hard look" at the relevant evidence. *See Marsh,* 490 U.S. at 374, 109 S.Ct. at 1859; *Steamboaters v. F.E.R.C.,* 759 F.2d 1382, 1393 (9th Cir.1985); *Town of Orangetown,* 718 F.2d at 35. The administrative record does not support a finding that the Forest Service took the requisite "hard look" at all the plaintiffs' reasonable concerns.

It is questionable whether an informed decision not to prepare an EIS can be made absent an effort to quantify the amount of unauthorized traffic which will occur upon the lengthening and improvement of FR266. *See Foundation for North American Wild Sheep,* 681 F.2d at 1178. The EA fails to adequately consider the effects of present and anticipated future human access to

Lamb Brook bears and birds as a result of its additional logging and increased ATV use resulting from the doubling of the length of FR266.

 The Forest Service also cites its mitigation measures to support its decision to issue a FONSI. While mitigation measures are appropriately considered in determining whether a federal action will have a significant impact, agencies should not cite inadequately-supported mitigation measures in an attempt to avoid preparing an EIS. *See Abenaki Nation*, 805 F.Supp. at 244–45.

 Here, the EA relies on the implementation of mitigation measures without support for their efficacy. Likewise, the EA fails to consider the effects of any failure of the proposed mitigation measures, a particularly troublesome aspect given the agreement that increased human presence will disrupt the bear habitat. *Cf. 27.09 Acres of Land*, 760 F.Supp. at 347–49. The record does not support a conclusion that any of these mitigation measures will actually work to cut down unauthorized use of FR266 or to protect the bird and bear habitats. *See* 40 C.F.R. § 1508.27(b)(5).

 Furthermore, the EA and DN leave confusion as to the Forest Service's future logging and road building plans. *See Seattle Audubon Society v. Moseley*, 798 F.Supp. 1473, 1478–79 (W.D.Wash.1992) ("An agency must candidly disclose in its EIS the risks posed by its proposed action.") (citation and quotations omitted), *aff'd*, 998 F.2d 699 (9th Cir.1993). By its very nature, the Management Area designated as 3.1 requires continuous timber harvesting. *See, e.g.,* Affidavit of Christopher E. Casey at para. 3. The EA describes the FR266 extension as a "temporary intermittent use" road. *See* EA at 1, 5. Yet the Forest Service simultaneously maintains that the extension to FR266 will not be maintained after initial logging is completed in an anticipated 3–5 years. Overall, the Court finds Alternative E necessarily contemplates a long-term commitment to harvesting trees to keep certain areas thinned or cleared. Because the current plan establishes a precedent which will require an unclear amount of future tree removal activity,

preparation of an EIS is appropriate. *See* 40 C.F.R. § 1508.27(b)(6).

 In sum, inconsistencies in many of the defendants' assertions, and not disagreements with their conclusions, compel this Court to conclude the decision to issue a FONSI was arbitrary and capricious. Furthermore, a review of the administrative record discloses a failure to take the required "hard look" at all the environmental consequences of Alternative E. Though lengthy, the EA does not adequately address all arguably significant effects of the Lamb Brook proposals. The cumulative effects on Lamb Brook's black bears and neotropical birds of the road extension, the proposed clearcutting, timber sales of uncertain duration, and the admitted but unquantified additional ATV use, require the Forest Service to prepare an EIS analyzing such effects. *See Thomas v. Peterson*, 753 F.2d 754, 757–59 (9th Cir.1985) (action to enjoin construction of timber road in National Forest roadless area); *see also Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 94 (2d Cir.1975) ("By failing to present a complete analysis and comparison of the possible dumping sites, the Final EIS fails to perform its vital task of exposing the reasoning and data of the agency proposing the action to scrutiny by the public and by other branches of government.") Accordingly, this Court finds the Forest Service has violated NEPA by failing to issue an EIS for the Lamb Brook project.

### III. CONCLUSION

The Plaintiff's Motion for Summary Judgment (paper 50) is GRANTED as to Count One. Plaintiff's Motion is DENIED as to Counts Two and Three.

The Defendants' Motion for Summary Judgment (paper 45) is DENIED as to Count One. Defendants' Motion is GRANTED as to Counts Two and Three.

The instant matter is REMANDED to the Forest Service for preparation of a site-specific EIS which takes into account the matters discussed in this Ruling. Furthermore, the defendants are hereby ENJOINED from conducting any further timber harvesting or

road-building activities in Lamb Brook until preparation of the aforementioned EIS and compliance with the procedures attendant thereto.

SO ORDERED.