NATIONAL AUDUBON SOCIETY, Sierra Club, The Wilderness Society, Conservation Law Foundation, Inc., Vermont Audubon Council, Restore: The North Woods, Preserve Appalachian Wilderness, Green Mountain Forest Watch, James Northup, Ellen Kingsbury Viereck, Tyler Resch, Mathew Jacobson, Plaintiffs–Appellees–Cross–Appellants,

v.

Terry W. HOFFMAN, former Forest Supervisor of the Green Mountain National Forest, James Bartelme, Forest Supervisor of the Green Mountain National Forest, Michael Schrotz, Manchester District Ranger, Floyd "Butch" Marita, Regional Forester, in their official capacities as employees of the U.S.D.A. Forest Service, Defendants–Appellants–Cross–Appellees.

Nos. 825, 1415, Dockets 96–6037, 96–6049.

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1997.

Decided Dec. 22, 1997.

Helen M. Toor, Chief, United States Attorney's Office, Civil Division, Burlington, VT (Charles R. Tetzlaff, United States Attorney for the District of Vermont, Burlington, VT, of counsel), for Defendants–Appellants–Cross–Appellees.

Stephen L. Saltonstall, Bennington, VT (Witten, Saltonstall, Woolmington, Bongartz & Campbell, P.C., Bennington, VT; Lewis M. Milford, Franklin Fraley, Conservation Law Foundation, Inc., Montpelier, VT, of counsel), for Plaintiffs–Appellees–Cross–Appellants.

Patrick Parenteau, Environmental Law Center, Vermont Law School, South Royalton, VT, filed a brief for Amicus Curiae Association of Forest Service Employees for Environmental Ethics.

Before: WINTER, Chief Judge, CARDAMONE and CABRANES, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal flows from the National Forest Service's decision to implement a logging project in Vermont's Green Mountain National Forest. The questions before us are, first, whether the Forest Service's decision to implement this proposed action has met the procedural requirements of the National Environmental Policy Act (NEPA), and, second, whether this proposed action is consistent with the Green Mountain National Forest Land and Resource Management Plan, as required by the National Forest Management Act (National Forest Act).

Congress has charged the United States Forest Service with the responsibility of managing our national forests. The Forest Service's decisionmaking process is governed by NEPA, which requires certain procedures to ensure that the agency fully considers the environmental consequences of its decisions prior to their implementation. The federal judiciary's responsibility to review an agency's decisions generally does not extend to finding facts and drawing conclusions that would infringe on the authority Congress delegated to the agency to make independent decisions in its area of expertise. Instead, for a court in an environmental case, the expression "Let's look at the record" means that judicial attention is focused on the agency's compliance with NEPA's procedure-forcing steps in an effort to ensure that environmental concerns are fully considered. Such consideration, it is hoped, will prevent needless damage to our natural resources and promote "enjoyable harmony" between humans and their environment.

BACKGROUND

Plaintiffs, a coalition of conservation organizations and environmentalists (collectively plaintiffs), brought suit under NEPA, 42 U.S.C. §§ 4321–4347, and the National Forest Act, 16 U.S.C. §§ 1600–1614, against defendants Terry Hoffman, James Bartelme, Michael Schrotz and Floyd Marita in their official capacities as employees of the United States Forest Service, an agency in the U.S. Department of Agriculture (collectively defendants or the Forest Service). The subject of this appeal is the Forest Service's decision approving a plan to build a road and conduct logging operations in a portion of the Green Mountain National Forest known as the Lamb Brook area (Lamb Brook).

The Green Mountain National Forest Land and Resource Management Plan (Forest Plan) was issued in 1987 and set forth a variety of specific management goals for general areas within this national forest. Lamb Brook is a 5,561 acre area located in Bennington and Windham Counties, Vermont. By designating Lamb Brook as Management Areas 3.1 and 2.1A, the Forest Plan contemplated intensive land management, timber harvesting, and recreational uses there. The Management Area 3.1 designation, which covers more than 80 percent of Lamb Brook, or over 4,000 acres, is intended to achieve "a mosaic of vegetative conditions" ranging from large trees to grasses and shrubs by even-aged timber cutting. Another 17 percent of Lamb Brook, designated as Management Area 2.1A, will be managed by uneven-aged cutting in order to maintain a continuous forest cover of trees varying in size and age.

To implement the Forest Plan in Lamb Brook, the Forest Service developed a proposed action plan. It then collected public comments on the proposed plan during a May 1991 meeting in Readsboro, Vermont (a town within Lamb Brook), and through responses to an April 1992 mailing. In January 1993 the Forest Service issued an environmental assessment (EA) which set forth its proposed action, as well as alternatives to that action, to achieve particular goals for Lamb Brook. The proposed action's stated aims included the improvement of vegetative diversity (mix of tree species, ages, and sizes); the protection of the Old Stage Road, a historic cultural resource; the maintenance of recreational opportunities; and the management of access to the area in order to protect resources and wildlife, and to control vandalism.

A month after issuing its EA, on February 9, 1993, the Forest Service handed down its

decision note choosing Alternative E as the course of action to implement the Forest Plan at Lamb Brook. The decision note included a "finding of no significant impact," a determination that Alternative E's implementation would not seriously affect the environment in Lamb Brook, thus absolving the Forest Service of the responsibility under NEPA to prepare an environmental impact statement (EIS).

The Forest Service's course of action pursuant to Alternative E includes implementation of a timber management program that allows a combination of shelterwood cuts and clear cuts, as well as individual tree and group selection cuts. The record explains that shelterwood cuts are a series of two or three cuttings which open the stand and stimulate natural reproduction, while clear cuts remove all trees from a designated area at one time, for the purpose of creating a new, even-aged stand. Individual tree selection involves removal of trees individually in a scattered pattern, from an area, and group selection cuts remove small groups of trees. Alternative E further contemplates recreational opportunities in the area by creating four scenic vistas (each 1/4 to 1/2 mile in size), relocating and extending a snowmobile trail, and enlarging an existing parking lot in the area. Finally, the Forest Service's action envisions improvement of two existing one-lane forest roads—FR 266 and FR 269—and the construction of a low standard, graveled road suitable for intermittent use extending FR 266 by 1.3 miles. The purpose of the extension is to provide access for logging trucks in the winter—the extension will be closed to all other traffic.

To mitigate the project's potential negative impact on black bears, into whose habitat the proposed road extension reaches, the Forest Service stated that it would limit construction of the road extension to a period of time between June 15 and September 1 (to avoid the bears' critical autumn feeding season) and avoid cutting beech trees showing evidence of recent bear use, i.e., bear claw marks (Mitigation Measures J and L, respectively). To prevent the unauthorized use of the extension by all-terrain vehicles (ATVs) and the resulting human disruption of the

bears, it proposed Mitigation Measure K: construction of a "berm," or mound of dirt, at the end of the existing FR 266 to give the appearance that the road ends at that point.

On June 9, 1994 plaintiffs filed the instant suit against the Forest Service in the United States District Court for the District of Vermont. They alleged that the Forest Service violated NEPA by failing to take into account the significant and deleterious effects Alternative E's implementation will have on Lamb Brook's black bear and neotropical migratory bird populations, as well as the value of the area in its present state. Specifically, plaintiffs maintained that the bears' reproductive capacities in Lamb Brook—designated by Vermont as a critical bear habitat—would be harmed by the loss of beech trees in the area, by increased human interference resulting from the logging activity, and from the ATVs' recreational use of the FR 266 extension. In addition, plaintiffs pointed out that the openings in the forest cover created by logging efforts would endanger the neotropical bird population by making it vulnerable to predators inhabiting the boundaries of forest clearings in what is called an "edge effect." The edge effect results because excessive logging and road-building enable "edge" animals to penetrate the forest and prey on those birds that inhabit the interior. Plaintiffs also claimed that defendants' proposed action is inconsistent with the Forest Plan and therefore violated the National Forest Act, which requires consistency between a forest plan and site-specific projects tied to the plan.

To support their allegations, plaintiffs made a motion to supplement the administrative record with several affidavits and declarations. Denying plaintiffs' motion in part and deferring decision on the balance, District Court Judge Billings, before whom this case was then pending, ordered defendants to submit additional affidavits and legal memoranda detailing "the reasons for and effectiveness of the proposed mitigation measures with regard to bear habitat" and its "conclusions regarding the 'edge effect' at the Lamb Brook site." The Forest Service made submissions, including affidavits and declarations of biologists and silviculturists,

which Judge Billings accepted on July 19, 1995 as supplements to the administrative record. The district court then granted plaintiffs' motion to add four affidavits to the record. These affidavits addressed the efficacy of Mitigation Measure K's proposed mounding at the end of existing FR 266 to discourage unauthorized use of the proposed extension.

On December 14, 1995 Chief Judge Murtha, to whom the case had been transferred, granted summary judgment in favor of the plaintiffs, finding that the Forest Service violated NEPA by failing to issue a site-specific EIS. The district court reasoned that the Forest Service failed to consider all relevant factors when determining the environmental significance of its proposed action and "had it taken the requisite 'hard look' at the context and intensity of its proposal ... [it] would have decided to prepare an EIS." *National Audubon Soc'y v. Hoffman*, 917 F.Supp. 280, 288 (D.Vt.1995). With respect to the alleged National Forest Act violation, the trial court granted summary judgment to the defendants, finding that plaintiffs had failed to demonstrate that the proposed action violated the Forest Plan. It remanded the case to the Forest Service for preparation of the site-specific EIS and enjoined any further timber harvesting or road-building activities until completion of that EIS. The Forest Service now appeals the adverse NEPA ruling, and the plaintiffs cross-appeal the grant of summary judgment against them on their National Forest Act claim. Before proceeding to the merits, we briefly outline the statutory and regulatory context in which this case arises.

## DISCUSSION

### I Statutes and Regulations

#### A. *NEPA*

NEPA was enacted to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. To achieve its goals, NEPA directs federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare a detailed statement on the environmental impact of the proposed action prior to implementation of the proposal. § 4332(2)(C)(i).

The required environmental impact statement must address any adverse unavoidable environmental effects resulting from the implementation, alternatives to the proposed action, the relationship between short-term uses and the long-term maintenance of the environment, and any irretrievable commitments of resources involved in the proposed action. § 4332(2)(C). This detailed statement "insures the integrity of the agency process by forcing it to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug" and serves as an "environmental full disclosure law so that the public can weigh a project's benefits against its environmental costs." *Sierra Club v. United States Army Corps of Eng'rs (Sierra Club II)*, 772 F.2d 1043, 1049 (2d Cir.1985); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989).

Whether a particular proposed action significantly affects the environment, thus necessitating the preparation of an EIS, is a threshold question. The Council on Environmental Quality (CEQ), created under NEPA, is responsible for promulgating regulations that supplement NEPA's statutory requirements. The CEQ regulations provide that if the agency is uncertain whether the impacts rise to the level of a major federal action requiring an EIS, the agency must prepare an environmental assessment. 40 C.F.R. §§ 1501.3, 1501.4, 1508.9. An EA is "a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of [an] EIS is necessary or concludes with a finding of no significant impact, in which case preparation of an EIS is unnecessary." *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir.1994); *see* 40 C.F.R. § 1508.9(a).

When the determination that a significant impact will or will not result from the proposed action is a close call, an EIS should be prepared. *See Foundation for N. Am. Wild Sheep v. United States Dep't of Agric.,* 681 F.2d 1172, 1178 (9th Cir.1982); *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir.1973); *see also* 40 C.F.R. § 1508.3 (defining "affecting" to mean "will or may have an effect on"); § 1508.18 ("Major federal action includes actions with effects that may be major.... Major reinforces but does not have a meaning independent of significantly."); § 1508.27(b)(4), (8), (9) (when considering the significance of a proposed action's impact, agency should consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial, [t]he degree to which the action may adversely affect [significant scientific, cultural or historic] sites [and][t]he degree to which the action may adversely affect an endangered or threatened species or its habitat"). It is only when the proposed action *"will not* have a significant effect on the human environment," 40 C.F.R. § 1508.13 (emphasis added), that an EIS is not required.

## B. *The National Forest Act*

The National Forest Act directs the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). The Forest Service's duties under the Act are inextricably intertwined with NEPA's aims. The National Forest Act requires each forest plan to be prepared in compliance with NEPA. § 1604(g)(1). Forest Service regulations provide that a forest plan must be accompanied by an appropriate draft and final EIS. 36 C.F.R. § 219.10(b).

A forest plan for an entire national forest unit is implemented through a series of individual site-specific projects. These projects are proposed and assessed to determine whether they are consistent with the forest plan. *See* 16 U.S.C. § 1604(i). At this stage, the agency also conducts the NEPA analysis described above to evaluate the environmental impact of the *specific* project.

*Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1512 (9th Cir.1992). A finding of no significant impact, thus obviating the need to prepare a site-specific EIS, is warranted when the Forest Service finds that the action is one anticipated in, consistent with, and sufficiently explored by, the programmatic EIS. *See Sierra Club v. Espy,* 38 F.3d at 796; *compare Ventling v. Bergland,* 479 F.Supp. 174, 179–80 (D.S.D.), *aff'd mem.,* 615 F.2d 1365 (8th Cir.1979) (no site-specific EIS required where programmatic EIS was sufficiently detailed), *with Manatee County v. Gorsuch,* 554 F.Supp. 778, 788 (M.D.Fla. 1982) (site-specific EIS required where programmatic EIS was insufficient to cover the environmental effects of the site-specific action); *see also Natural Resources Defense Council, Inc. v. Morton,* 388 F.Supp. 829, 838, 841 (D.D.C.1974) (requiring site-specific impact statement where programmatic statement on livestock grazing did not address local geographic conditions affecting decision to issue individual grazing permits), *aff'd mem.,* 527 F.2d 1386 (D.C.Cir.1976); Daniel R. Mandelker, *NEPA Law and Litigation* § 9.03 (1992). With that brief outline of the statutory and regulatory background in mind, we turn to the merits.

## II The NEPA Claim

The Forest Service followed this two-part NEPA/National Forest Act scheme in the case at hand. The Lamb Brook EA expressly states that it is part of the "second, and final, level of decisionmaking ... [which] involves site-specific analysis to meet the requirements of the National Environmental Policy Act and specific on-site resource needs." The Forest Service, however, does not urge that its programmatic EIS was sufficient to obviate the need for any additional environmental analysis under NEPA. In fact, it has not even submitted the programmatic EIS as part of the appellate record. The question before us therefore is whether the Forest Service violated the action-forcing process mandated by NEPA when it determined that its Lamb Brook project will not "significantly" affect the quality of the human environment in that area.

## A. Standard of Review

We have consistently held that whether a particular agency action will have a "significant" effect on the environment is a substantive question left to the informed discretion of the agency proposing the action. *Orangetown v. Gorsuch*, 718 F.2d 29, 34 (2d Cir.1983); *Sierra Club v. United States Army Corps of Eng'rs* (*Sierra Club I*), 701 F.2d 1011, 1029 (2d Cir.1983); *see also Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 377–78, 109 S.Ct. 1851, 1859–60, 104 L.Ed.2d 377 (1989) (applying arbitrary and capricious standard to agency's decision whether to prepare a supplemental impact statement, which the Court stated was similar to the decision whether to prepare an impact statement in the first instance). However, because NEPA provides a procedural framework within which such judgments must be made, courts are responsible for ensuring that agencies comply with the statutory duty imposed on them by Congress. *Orangetown*, 718 F.2d at 35. Therefore, in reviewing an administrative decision not to issue an EIS, a federal court must undertake a two-step analysis. First, we must consider whether the agency took a "hard look" at the possible effects of the proposed action. *See Village of Grand View v. Skinner*, 947 F.2d 651, 657 (2d Cir.1991) (two-step inquiry applied to decision not to issue a supplemental environmental impact statement); *Sierra Club I*, 701 F.2d at 1029–30. Second, if the agency has taken a "hard look," we must ask whether the agency's decision was arbitrary or capricious. *See Grand View*, 947 F.2d at 657; *Marsh*, 490 U.S. at 375–76, 109 S.Ct. at 1859–60. Our inquiry must be "searching and careful," although the ultimate scope of judicial review is narrow. *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861. The judiciary must not inject itself into an area where the choice of action to be taken is one confided by Congress to the executive branch. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir.1977).

## B. The Record on Appeal

*1. The Record Rule.* We must also determine the scope of the evidence upon which the merits of this appeal will be resolved. Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Supplementation of that record upon remand to the agency may be necessary when the record does not support the agency action, when the agency has not considered all relevant factors, or when the reviewing court simply cannot evaluate the challenged action on the basis of the record before it. *Florida Power*, 470 U.S. at 744, 105 S.Ct. at 1606.

Despite the general "record rule," an extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 983, 51 L.Ed.2d 192 (1977).

Deviation from this "record rule" occurs with more frequency in the review of agency NEPA decisions than in the review of other agency decisions. *See generally* Susannah T. French, Comment, *Judicial Review of the Administrative Record in NEPA Litigation*, 81 Cal. L.Rev. 929 (1993). This occurs because NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside

the administrative record. To limit the judicial inquiry regarding the completeness of the agency record to that record would, in some circumstances, make judicial review meaningless and eviscerate the very purposes of NEPA. The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to its attention. Thus, we have held that the consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives. *County of Suffolk*, 562 F.2d at 1384 ("[I]n NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives ..., which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored."); *see also National Audubon Soc'y v. Forest Serv.*, 46 F.3d 1437, 1447–48 (9th Cir.1993) (applying the *County of Suffolk* exception); *Sabine River Auth. v. Department of Int.*, 951 F.2d 669, 678 (5th Cir.1992) (providing for review of evidence in addition to the administrative record to determine whether the agency adequately considered the environmental effects of the particular project); *but see Cronin v. Department of Agric.*, 919 F.2d 439, 444 (7th Cir.1990) (allowing the admission of evidence outside of the administrative record in order to challenge an environmental assessment only where there is no record and no feasible method of compiling a record in time to protect the objector's rights).

■ Nonetheless, deviation from the record rule, even in the review of NEPA decisions, is limited. While we allow the consideration of extra-record evidence, review of an agency's action is not *de novo*. Courts may conduct plenary review, and consider additional information obtained from the parties through affidavits or testimony, only when the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed action. *See Sierra Club II,* 772 F.2d at 1051–52. We realize that the record compiled by the agency will often contain sufficient information to permit the court to make this judgment, thereby obviating the need for considering extra-record evidence.

■ 2. *The Adequacy of the Record in this Case.* In the instant case the district court found "gaps" in the agency's consideration of the "edge effect" and proposed mitigation measures, and allowed the Forest Service to "supplement the record" with affidavits and memoranda explaining its decision. These gaps in the agency-compiled record effectively prevented the district court from determining whether the Forest Service had fully considered the "edge effect" and proposed mitigation measures. As a result, the court invited and received additional agency submissions analyzing the impact of its proposed actions on the birds and the bears and determined, based upon these submissions, that these additional affidavits were sufficient for it to conduct an effective review of the Forest Service's decision with respect to the edge effect as well as Mitigation Measures J and L. However, the court also found the Forest Service's explanation of Mitigation Measure K inadequate because its additional submissions suggested little ATV use in the Lamb Brook area—contrary to the agency's prior recognition in its EA that illegal ATV use in the area caused a problem. Because of that inconsistency, the district court allowed plaintiffs to supplement the record with additional evidence limited to this issue.

The case law permits a reviewing court to *consider* evidence beyond that which is contained in the administrative record in certain circumstances. But, no good authority exists to permit a reviewing court to add evidence that will actually be *included* as part of an agency-compiled record. Hence, we do not approve the district court's action in supplementing the Forest Service's record. Instead, we review the parties' additional submissions as extra-record evidence under the legal standard discussed above to determine whether the district court properly received

**16**

and considered extra-record evidence from the parties.

We review a district court's consideration of matters outside the administrative record under an abuse of discretion standard. *See Sierra Club II,* 772 F.2d at 1052; *cf. Valley Citizens for a Safe Environ. v. Aldridge,* 886 F.2d 458, 460 (1st Cir.1989) (determining that the consideration of extra-record evidence is "discretionary with the reviewing court"). The determination to allow the agency to introduce additional explanations when it had not adequately explained its reasoning in the record was appropriate. *See Sierra Club II,* 772 F.2d at 1052.

Plaintiffs, however, assert that it was error to allow the agency to make broad submissions while their attempts to introduce additional evidence were limited. They sought, in particular, to introduce affidavits from bear and bird experts, photographs of bear-scarred beech trees and bear "nests" in those trees and photographs of tracks left by ATVs on trails within Lamb Brook where they were not authorized to operate. The district court did not abuse its discretion in concluding that the record sufficiently explained the basis for the Forest Service's conclusions regarding the proposed action's effect on the birds and the bears and that therefore any further supplementation would be unnecessary. Hence, we think the court appropriately limited plaintiffs' submissions to fill the gap in the administrative record only with respect to the issue of Mitigation K's efficacy.

3. *Bad Faith.* Plaintiffs also sought to add to the record evidence in support of their point that the agency acted in bad faith by improperly using its EA as a *post hoc* tool to justify decisions it had already made. Specifically, they sought to submit the affidavit of Shelley Hight, a former Forest Service employee, who alleges that the Forest Service had already decided to issue a "finding of no significant impact" prior to completing the EA and, in a NEPA training session, taught its employees to circumvent NEPA requirements by tailoring documents to support the predetermined result. The Forest Service responded to this contention with affidavits from other Forest

Service employees stating that Hight misconstrued the purpose of the NEPA training.

We find support for the district court's conclusion that plaintiffs failed to make the required "strong showing" of bad faith. *See Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825. Accordingly, we find that the district court's decision not to receive this extra-record evidence does not constitute an abuse of discretion.

### C. *The Lamb Brook Project*

The district court determined that the Forest Service's finding of no significant environmental impact violated NEPA for two reasons: (1) the agency's EA failed to take a "hard look" at all the relevant effects of the proposed action, and (2) had the Forest Service taken a hard look, it necessarily would have decided that the project could result in a significant impact, thereby requiring completion of a site-specific EIS. 917 F.Supp. at 288–89. We turn to an analysis of these rulings.

#### 1. *Failure to Adequately Consider Relevant Factors*

The district court based its conclusion that the Forest Service failed to take a hard look on (1) the agency's failure to procure data to support its mitigation efforts with respect to the unauthorized use of FR 266 and protection of bird and bear habitats, (2) certain perceived inconsistencies in the EA's discussion of future logging operations, and (3) the agency's treatment of the Readsboro Town Plan.

In support of his finding that the agency failed to take a hard look, the trial judge focused primarily on the Forest Service's failure to quantify the amount of unauthorized traffic that will occur as a result of the lengthening and improvement of FR 266. In the EA, the Forest Service conceded that the unauthorized use by ATVs is a problem, that the amount of such use is unknown, and that it would likely increase with the improvements to existing FR 266 and its extension. Moreover, one of its experts notes that "[i]f increased permanent public access during the spring, summer, and fall results from this

action then I would concur that there would be a strong potential for the creation of an adverse impact to black bears." The Forest Service's proposed mitigation measure to counter the impact of the unauthorized traffic, Mitigation Measure K, calls for the "obliterat[ion]" of a section of FR 266 at a point near its current end, thereby hopefully causing unauthorized users to believe that the road stops there. But a question remains: whether it is sufficient for the agency to propose mitigation measures—the efficacy of which are seriously disputed—to support its finding of no significant impact.

 When the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an EIS. *See Friends of the Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1556–57 (2d Cir.1992); *Abenaki Nation of Mississquoi v. Hughes*, 805 F.Supp. 234, 245 (D.Vt.1992), *aff'd*, 990 F.2d 729 (2d Cir. 1993) (affirming for substantially the same reasons stated by the district court). In practice, mitigation measures have been found to be sufficiently supported when based on studies conducted by the agency, *see Ompompanoosuc*, 968 F.2d at 1555 (study of proposed mitigation conducted by agency along with consultation with another agency), or when they are likely to be adequately policed, *see Abenaki*, 805 F.Supp. at 239 n. 9 (mitigation measures included as mandatory conditions imposed upon licenses).

In *Abenaki*, the efficacy of the mitigation measures were assured because they were included as mandatory conditions in the issued permits. These conditions required implementation of a detailed plan to monitor the effects of the proposed action and the mitigation of those effects in the event wetlands were lost as a result. Further, the plan required monitoring of the mitigation efforts, if any were made, to ensure that they were effective and required implementation of an alternative mitigation plan, spelled out in detail, if they were not. *Id.*

We emphasize the requirement that mitigation measures be supported by substantial evidence in order to avoid creating a tempta-

tion for federal agencies to rely on mitigation proposals as a way to avoid preparation of an EIS. That is to say, agencies should define "significance" broadly and not rely on proposed mitigation measures as an excuse to avoid preparing an EIS. *See Abenaki*, 805 F.Supp. at 244. In this case, we have no assurance of Measure K's efficacy. The Forest Service conducted no study of its likely effects, proposed no monitoring to determine how effective the proposed mitigation would be, and did not consider alternatives in the event Measure K fails. Although the Forest Service affidavits considered by the district court suggest that additional measures may be used to control illegal ATV use, there is no indication that the agency reviewed these measures at the time of its decision, or that it afforded the public an opportunity to comment on them. Absent substantial evidence to support the efficacy of Measure K, we, like the district court, are left with the firm conviction that the Forest Service could not have adequately considered the significance of its proposed action's impact on the environment. Because this factor alone convinces us that the Forest Service failed to take a hard look, we need not address the district court's remaining objections to the agency's environmental assessment.

The mode of analysis employed in this case is intended to allow an agency to omit the preparation of an EIS when it determines that a mitigation measure will sufficiently limit the negative environmental impact of a proposed project. In the instant case, for example, had Measure K included a program to monitor and ensure its effectiveness, there would then have been substantial evidence to support it. We hope our holding that the Forest Service's attempt to moderate one of the anticipated impacts of its proposed logging project was not supported by substantial evidence will ensure that such agencies in NEPA cases propose mitigation measures supported by studies and/or procedures to monitor their effectiveness.

In sum, we agree that the Forest Service violated NEPA by failing to adequately consider all relevant environmental factors prior to making its finding of no significant impact.

2. *Review of No Significant Impact Under the Arbitrary and Capricious Standard*

 In addition to concluding that the agency failed to consider all relevant factors, the district court found that the agency's finding of no significant impact was arbitrary. It ruled that had the Forest Service taken a hard look "at the context and intensity of its proposal," it necessarily would have decided to prepare an EIS.

As discussed earlier, when it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared. This view is reinforced by the CEQ Guideline's direction to agencies to consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial" when determining significance. 40 C.F.R. § 1508.27(b)(4). Moreover, we think NEPA's policy goals require agencies to err in favor of preparation of an EIS when the proposed action is likely to have a significant environmental impact. Consequently, we agree with the district court that a party challenging the agency's decision not to prepare an EIS must show only that there is a substantial possibility that the action may have a significant impact on the environment, not that it clearly will have such an impact. *See Foundation for N. Am. Wild Sheep,* 681 F.2d at 1177–78; *Save Our Ten Acres,* 472 F.2d at 467. The Forest Service's determination that preparation of an EIS was not necessary, based on the record before it, was therefore arbitrary and capricious.

D. *Remedy*

 Our agreement with the legal standard employed by the district court does not necessitate agreement with its application. The relevant question is whether the proposed action may have a significant impact on the environment. The district court undertook to answer the question, despite an incomplete record, holding that the impact of the proposed action was potentially significant. The question is substantive, and consequently not one within the purview of the district court. Rather, it is one the Forest Service must decide.

The Forest Service's failure to weigh the factors related to its project's environmental impact is a flaw that precludes a definitive determination as to whether the project may have a significant impact. What impact the Forest Service's proposed action will have on the birds, the bears, and the existence value of Lamb Brook is not clear because the scope of current and future ATV use is unknown. We also take notice of possible gaps in the administrative record with respect to FR 266's future use and maintenance, as highlighted by the district court. The district court overstepped the narrow confines of judicial review of an agency's decision when it jumped to the conclusion that the impact of the project would be "arguably significant" and, on that basis, ordered the agency to prepare an EIS.

Because the question of whether the project may have significant adverse impacts is one that the Forest Service must decide, the appropriate remedy is to remand the case to the agency to correct the deficiencies in the record and in its analysis. *See Fritiofson v. Alexander,* 772 F.2d 1225, 1238–39 (5th Cir. 1985); *Louisiana Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1053 (5th Cir.1985); *cf. Foundation on Econ. Trends v. Heckler,* 756 F.2d 143, 154 (D.C.Cir.1985) (directing the agency to complete a more adequate EIS so that it could be determined whether an EIS was required). The Forest Service should reconsider the issues which we have held were inadequately addressed in its initial environmental assessment, and it should also address additional possible shortcomings raised by the district court which we have elected not to explore here. After doing so, it should reconsider its finding of no significant impact in light of its additional investigation and the applicable legal standard.

Plaintiffs declare that a remand to the agency may result in nothing more than a new rationalization for the same result, rather than a "hard look" at the potential effects of the proposed action. *See* Louis L. Jaffe, *Judicial Control of Administrative Action* 589 (1965); *see also Louisiana v. Lee,* 758 F.2d 1081, 1085 (5th Cir.1985) (EA revised in response to challenge of agency's finding of no significant impact is *post-hoc* rationaliza-

tion that should be reviewed critically). Nonetheless, NEPA is a procedural statute and an agency's substantive decisions are intended to be largely insulated from judicial review. Our task is to ensure NEPA compliance with the environmental policies and the law without infringing upon the agency's decisions in areas where it has expertise.

Consequently, a remand for reconsideration of the EA carefully balances the need for judicial review of the procedures followed with the need to recognize the agency's independent decisionmaking power regarding the substantive issues before it. Moreover, a remand in this case may improve the agency's decisionmaking processes and encourage NEPA compliance in the long run by inducing the agency to make a better initial investigation with respect to the impact of a proposed action. *See* Jaffe, *supra*, at 589.

### III The National Forest Management Act Claim

■ On their cross-appeal plaintiffs aver that the Lamb Brook Project's proposed extension of FR 266 is inconsistent with the Forest Plan, and that this inconsistency violates the National Forest Act. Under that Act the Forest Service must ensure that all of its on-the-ground projects in the Green Mountain National Forest comply with its Forest Plan. 16 U.S.C. § .1604(i). To demonstrate this alleged inconsistency, plaintiffs cite a portion of the Forest Plan, which provides in part that "[n]o new roads will be built primarily for hauling timber," and assert that the EA demonstrates that the proposed FR 266 extension is intended primarily for hauling logs.

Plaintiffs' inconsistency argument is illfounded. The Forest Service's decision note states that the proposed timber removal is intended to improve wildlife habitat and vegetative diversity as well as to sell timber products. It follows that the extension of FR 266 may fall within the category of roadbuilding intended for "recreation-wildlife-timber access," rather than primarily for hauling timber.

Even if the proposed extension of FR 266 is intended primarily for forest products removal reasons, there is currently no absolute prohibition against the building of roads for the purpose of private timber hauling in the Forest Plan. The Plan itself designates the land in question as Management Areas 2.1A and 3.1, both of which allow for timber management. Moreover, the Plan lists its management goals as including:

> Construct or reconstruct single lane, local roads where the overall benefits to society outweigh the costs, using the following priority: 1) eliminate resource damage which is occurring due to location or standard of existing roads, 2) provide legal public access for use and enjoyment of parts of the National Forest that are presently separated from roads by private land, 3) meet demands for roaded recreation activities and 4) *gain access for timber management on the land designated for timber management.*

(emphasis added). The language cited by plaintiffs is nothing more than an isolated statement in an appendix that discusses the "projected local roads" to be built through 1995, the first 10 years of the plan's existence. This is hardly a hard and fast prohibition on timber roads.

There is no indication that the Forest Service's proposal to extend FR 266 violates the Forest Plan. Thus, the district court's summary judgment dismissal of plaintiffs' National Forest Act claim against defendants should be affirmed.

### CONCLUSION

Accordingly, for the reasons stated, we affirm the judgment insofar as it found the Forest Service's environmental assessment inadequate under NEPA. The judgment is reversed to the extent that the district court made a finding of potentially significant impact and ordered the Forest Service to prepare a site-specific environmental impact statement, and the case is remanded to the district court with instructions that it order the Forest Service to address the issues discussed and reassess the environmental significance of the Lamb Brook Project in light of these issues. The summary judgment dismissal of plaintiffs' National Forest Act claim is affirmed.

**20**

Affirmed in part, reversed in part, and remanded.